UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SCAN HEALTH PLAN,

Plaintiff,

v.

DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*,

Defendants.

Civil Action No. 26-2391 (CRC)

**DEFENDANTS' COMBINED MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT THEREOF**

## TABLE OF CONTENTS


Table of Contents ........ i

Table of Authorities ........ ii

I. Statutory and Regulatory Background ........ 2

II. Factual Background and Procedural History ........ 7

STANDARD OF REVIEW ........ 9

ARGUMENT ........ 10

I. SCAN's Claims They Pertain to Contract H0976 Should be Dismissed for Lack of Subject-matter Jurisdiction. ........ 10

A. Injury in Fact ........ 10

B. Redressability ........ 12

II. The Medicare Advantage Star Ratings Measure Specifications Do Not Violate the Medicare Statute's Rulemaking Provision. ........ 12

A. The Medicare Statute Does Not Require Notice-and-Comment Rulemaking for Star Ratings Measures. ........ 13

B. SCAN's interpretation of § 1395hh(a)(2) creates an unnecessary conflict with another Medicare provision, § 1395w-23(b). ........ 21

C. SCAN's position would make the Star Ratings unworkable. ........ 22

III. Any Relief Should be Appropriately Limited ........ 23

A. Remand Is the Appropriate Remedy. ........ 23

B. SCAN's Argument Is Not Limited to the Measures It Challenges. ........ 24

Conclusion ........ 27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Air Excursions LLC v. Yellen*,
66 F.4th 272 (D.C. Cir. 2023)....11
*Ala. Med. Ctr. v. Sebelius*,
572 F.3d 912 (D.C. Cir. 2009)....9
*Allina Health Servs. v. Sebelius*,
746 F.3d 1102 (D.C. Cir. 2014)....24
*Armstrong v. Exceptional Child Ctr, Inc.*,
575 U.S. 320 (2015)....26
*Azar v. Allina Health Servs.*,
587 U.S. 566 (2019)....14
*Clover Ins. Co. v. U.S. Dep't of Health & Human Servs.*,
No. 2:25-CV-142, 2026 WL 1483515 (S.D. Ga. May 27, 2026)....7, 8, 17, 18
*Clover Ins. Co. v. U.S. Dep't of Health & Human Servs.*,
No. 2:25-CV-142, 2026 WL 1510382 (S.D. Ga. May 29, 2026)....8
*Corley v. United States*,
556 U.S. 303 (2009)....22
*County of Los Angeles v. Shalala*,
192 F.3d 1005 (D.C. Cir. 1999)....9
*Di Giovanni v. Camden Fire Ins. Ass'n*,
296 U.S. 64 (1935)....26
*FDA v. Wages & White Lion Invs., L.L.C.*,
604 U.S. 542 (2025)....23, 24
*Gentiva Healthcare Corp. v. Sebelius*,
857 F. Supp. 2d 1 (D.D.C. 2012)....9
*HMO La., Inc. v. HHS*,
793 F. Supp. 3d 150 (D.D.C. 2025)....20
*Holland v. Florida*,
560 U.S. 631, (2010)....25
*Humana Inc. v. U.S. Dep't of Health & Hum. Servs.*,
806 F. Supp. 3d 642 (N.D. Tex. 2025)....passim
*In re Long- Distance Tel. Serv. Fed. Excise Tax Refund Litig.*,
751 F.3d 629 (D.C. Cir. 2014)....24
*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)....10, 12
*MSP Recovery Claims v. Metropolitan Gen. Ins. Co.*,
40 F.4th 1295 (11th Cir. 2022)....18
*N.C. Fisheries Ass'n, Inc. v. Gutierrez*,
550 F.3d 16 (D.C. Cir. 2008)....23, 24
*Owner-Operator Indep. Drivers Ass'n, Inc. v. Dep't of Transp.*,
879 F.3d 339 (D.C. Cir. 2018)....10
*PPG Indus., Inc. v. United States*,
52 F.3d 363 (D.C. Cir. 1995)....9, 23

*SEC v. Chenery*,
318 U.S. 80 (1943) ....................24
*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) ....................10, 12
*Starbuck Corp. v. McKinney*,
602 U.S. 339 (2024) ....................25
*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) ....................11
*TransUnionLLC v. Ramirez*,
594 U.S. 413 (2021) ....................12
*U.S. v. Coastal Refining and Marketing, Inc.*,
911 F.2d 1036 (5th Cir. 1990) ....................26
*United States ex rel. Spay v. CVS Caremark Corp.*,
875 F.3d 746 (3d Cir. 2017) ....................3
*Winter v. Natural Resources Defense Council, Inc.*,
555 U.S. 7 (2008) ....................26

**Statutes**

5 U.S.C. § 706....................9
5 U.S.C. § 706(2)(A)....................10
5 U.S.C. § 706(2)(C) ....................10
5 U.S.C. § 706(2)(D)....................10
42 U.S.C. § 1395....................2
42 U.S.C. § 1395c ....................3
42 U.S.C. § 1395hh(a)(2) ....................passim
42 U.S.C. § 1395w-21(a)....................15
42 U.S.C. § 1395w-22(a)(3) ....................20, 21
42 U.S.C. § 1395w-22(e)....................8
42 U.S.C. § 1395w-23(b) ....................21
42 U.S.C. § 1395w-23(b)(2)....................5, 16
42 U.S.C. § 1395w-23(o)(1)....................6
42 U.S.C. § 1395w-23(o)(4)....................5
42 U.S.C. § 1395w-27(e)(4) ....................19
42 U.S.C. § 1395w-101(a)(3) ....................4
42 U.S.C. § 1395x....................17
42 U.S.C. § 1395x(a)....................14
42 U.S.C. § 1395x(u) ....................14
42 U.S.C. §§ 1395d....................15, 17
42 U.S.C. §§ 1395j–1395w-6 ....................3
42 U.S.C. §§ 1395w-21–1395w-28 ....................3
42 U.S.C. §§ 1395w-101–1395w-154....................3

**Rules, Regulations, and Other Authorities**

Federal Rule of Civil Procedure 12(b)(1)....................2, 10
42 C.F.R. 422.164(c)....................5

42 C.F.R. 422.266(b)....................17
42 C.F.R. § 400.202....................14
42 C.F.R. § 422.164....................5, 23
42 C.F.R. § 422.254....................4
42 C.F.R. § 422.258....................4
42 C.F.R. §§ 422.102....................15
42 C.F.R. §§ 422.162(b)....................6
42 C.F.R. §§ 422.254(d)....................18
42 C.F.R. §§ 422.260....................4, 7
83 Fed. Reg. 16440 (Apr. 16, 2018)....................5

## INTRODUCTION

Congress directed the Centers for Medicare & Medicaid Services (CMS) to calculate Medicare Advantage Star Ratings on a one- through five-star scale in half-star increments, which allows Medicare beneficiaries to comparison shop among hundreds of health insurance plans and can result in additional "quality bonus payments" to plans to provide additional benefits to Medicare beneficiaries. CMS evaluated Plaintiff SCAN Health Plan's ("SCAN") contracts on a series of quality measures and calculated the Star Ratings for two contracts at issue—contracts H5425 and H0976—to be four out of five stars. The technical specifications detailing how to calculate the measures on which SCAN was evaluated were set out in hundreds of pages of guidance called Technical Notes. SCAN challenges certain of these measures on the ground that the technical specifications in CMS's Technical Notes should have been promulgated through notice-and-comment rulemaking under 42 U.S.C. § 1395hh(a)(2). That provision, however, does not apply.

The technical specifications are not rules, requirements, or statements of policy that "establish[] or change[] a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive benefits." SCAN's primary argument—that these measure specifications govern payment for services—ignores the statutory text and structure of the Medicare program. "Payment for services" as used in the Medicare statute refers to the amounts paid to the providers of medical services in exchange for furnishing Medicare-covered services to beneficiaries. And Star Ratings measure specifications do not affect—much less "govern"— "payment for services" under the Medicare statute as they have nothing to do with the amount providers of medical services are paid for covered services under Medicare. SCAN, instead, conflates the Medicare statute's use of

"services" with its use of "benefits," which refers to insurance coverage for the cost of medical services guaranteed to Medicare beneficiaries under the Medicare program. And SCAN's Star Ratings are wholly independent of its obligation to provide insurance benefits (*i.e.*, pay for Medicare-covered services on behalf of Medicare beneficiaries). A plan's obligation to pay for Medicare-covered services on behalf of beneficiaries exists whether or not it receives quality bonus payments.

SCAN's arguments that Star Ratings govern "the scope of benefits" and "eligibility" are similarly meritless. SCAN may offer the supplemental benefits because it receives Star Ratings-related quality bonus payments. This does not mean that the Star Ratings "govern[]" the "scope of benefits" that SCAN must offer, which are statutorily prescribed by the Medicare statute. And while CMS's regulations allow CMS to terminate plans with persistently low Star Ratings, they do not require it. Consequently, CMS's Star Ratings measure specifications do not "govern[]" eligibility. Because SCAN's theories are at odds with the plain text of the Medicare statute, the Court should reject them.

Finally, this Court should dismiss SCAN's claims as they pertain to contract H0976 for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) because SCAN has no standing to assert those claims. If CMS recalculated SCAN's Star Rating for contract H0976 excluding the ten measures it requests that this Court invalidate, its Star Rating would remain four stars. Consequently, SCAN lacks standing to assert its claims as to contract H0976.

## I. <u>Statutory and Regulatory Background</u>

Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq*. ("Medicare statute"), establishes the Medicare program, a federally funded and administered health insurance program for eligible elderly and disabled persons and certain individuals with end stage renal disease. *See*

42 U.S.C. § 1395c. The Secretary administers the Medicare program through CMS, a component agency of the United States Department of Health and Human Services.

The Medicare program is divided into four major components. Part A, the hospital insurance benefit program, provides health insurance coverage for certain inpatient hospital care, post-hospital care in a skilled facility, post-hospital home care services, and other related services. *See* 42 U.S.C. §§ 1395c–1395i-6. Part B, the supplemental medical insurance benefit program, generally pays for a percentage of certain medical and other health services, including physician services, supplemental to the benefits provided by Part A. *See* 42 U.S.C. §§ 1395j–1395w-6. Under Part C, a Medicare beneficiary can elect to receive his or her Medicare benefits through a public or private healthcare plan. *See* 42 U.S.C. §§ 1395w-21–1395w-28. Finally, Part D is the voluntary prescription drug benefit program. *See* 42 U.S.C. §§ 1395w-101–1395w-154.

Under Part C's Medicare Advantage program, the federal government pays insurers to provide the coverage that participating beneficiaries would otherwise receive through Parts A and B (sometimes known, collectively, as "traditional" Medicare). *Id.* § 1395w-22(a). These insurers, known as Medicare Advantage organizations (or MAOs), contract to provide coverage in a particular geographic area. Beneficiaries can then choose among the plans available where they reside. *Id.* § 1395w-21(b). Medicare Advantage organizations receive a predetermined sum for providing the same coverage that the beneficiary would receive under Parts A and B, based in part on the demographic and health characteristics of that beneficiary. *Id.* § 1395w-23(a)(1)(A), (C).

Like Medicare Advantage, Medicare Part D's prescription drug benefit program "operates as a public-private partnership between [CMS] and . . . private insurance companies called 'Sponsors' that administer prescription drug plans." *United States ex rel. Spay v. CVS Caremark Corp.*, 875 F.3d 746, 749 (3d Cir. 2017). Prescription drug coverage need not be provided in

combination with coverage of non-pharmacy outpatient services, but it may be. When Medicare Advantage plans also offer prescription drug coverage under Medicare Part D, those dual-purpose plans are known as MA-PD plans.[1] *See* 42 U.S.C. § 1395w-101(a)(3). Medicare Advantage organizations that offer Part D plans are called Part D sponsors.

CMS pays Medicare Advantage organizations a capitated per-beneficiary fixed amount in exchange for the MAO's furnishing of insurance benefits to Medicare beneficiaries who enroll in their plan. To calculate these payments, CMS first determines a "benchmark," based on the per-capita cost of covering Medicare beneficiaries under Parts A and B in the relevant geographic area. *Id.* § 1395w-23(n); 42 C.F.R. § 422.258. Each Medicare Advantage organization then submits a "bid" to CMS for each plan, indicating the payment the Medicare Advantage organization will accept to cover a beneficiary with an average risk profile in that area. 42 C.F.R. § 422.254. If the MAOs bid is less than the benchmark, the bid becomes its "base payment"—the amount it is paid for covering a beneficiary of average risk— and the MAO receives a "rebate" calculated from the amount by which its bid is lower than the benchmark. The Medicare Advantage organization must use this rebate to cover additional health care benefits that are not benefits under original Medicare or to reduce beneficiary plan premiums or cost-sharing. 42 U.S.C. § 1395w-24(b)(1)(C); 42 C.F.R. §§ 422.260, 422.266(b)(1). If the Medicare Advantage organization's bid is greater than the benchmark, then the benchmark becomes its base payment, and the MAO must charge beneficiaries a premium to make up the difference. *See* 42 U.S.C. §§ 1395w-23(a)(1)(B)(ii), 1395w-24(b)(2)(A).

---

[1] SCAN's Medicare Advantage contracts at issue offer multiple plan benefit packages. However, this brief will use the phrases Medicare Advantage organization, MAO, and Medicare Advantage plan to refer to MA-PD plans.

To assist beneficiaries with choosing a Medicare Advantage plan, Congress directed CMS to issue annual ratings under a five-star rating system. 42 U.S.C. § 1395w-23(o)(4). The statute reads: "The quality rating for a plan shall be determined according to a 5-star rating system (based on the data collected under section 1395w-22(e) of this title)." 42 U.S.C. § 1395w-23(o)(4)(A); *see generally* 83 Fed. Reg. 16440, 16520-25 (Apr. 16, 2018). The CMS Star Ratings system rates each plan on a 1-to-5 star scale using multiple quality measures (30 to 45 for the 2026 Star Ratings, depending on whether a contract is a "special needs plan" and whether it provides Part D benefits). These measures assess health outcomes, patient experience, and care quality. In 2010, Congress required CMS to begin using this Star Ratings system to provide additional payments to plans. *See* 42 U.S.C. § 1395w-23(o)(4).

CMS has promulgated descriptions of all the measures used to calculate the Star Ratings through notice-and-comment rulemaking. In 2018, CMS codified via rulemaking the list of then-extant Star Ratings measures and also promulgated 42 C.F.R. § 422.164, which describes how it will add, remove, and modify measures going forward. *See* 83 Fed. Reg. 16440, 16538-54. (Apr. 16, 2018). CMS uses its annual Advance Notice and Rate Announcement process, which provides MAOs with notice and the opportunity to comment, to "announce potential new measures." *See* 42 U.S.C. § 1395w-23(b)(2); *see also* 42 C.F.R. 422.164(c). CMS then proposes and finalizes new measures through notice-and-comment rulemaking. 42 C.F.R. § 422.164(c).

The detailed technical specifications for each measure each year appear in the annual Technical Notes, but are not implemented through notice-and-comment rulemaking. *See* 2026 Technical Notes, https://www.cms.gov/files/document/2026-star-ratings-technical-notes.pdf. At a high level, the Technical Notes describe in detail how CMS converts the raw data about a contract's performance into measure-level ratings and, ultimately, into each contract's final Star

Rating. *See* Technical Notes, 29-107 (describing detailed measure specifications and listing case-mix coefficients). Each year, CMS publishes in January an advanced notice alerting MAOs and other interested parties to various changes being considered for the next Medicare Advantage plan year, including updates for the Star Ratings for future years. *See* 2026 Star Rating Methodologies https://perma.cc/KWB8-VLWK. That notice includes a discussion of the measures that CMS plans to use for the coming plan year. *Id.* at 109-114. CMS then circulates to plans (and displays on its website) a Technical Notes document that provides details about the current year's Star Ratings.

CMS publishes the Star Ratings each October for the upcoming year at the contract level, with each plan offered under that contract assigned the contract's rating. *See* 42 C.F.R. §§ 422.162(b), 422.166, 423.182(b), and 423.186. CMS published the 2025 Star Ratings, for example, in October 2024. CMS, Fact Sheet – 2025 Medicare Advantage and Part D Star Ratings (Oct. 10, 2024) ("Fact Sheet"), *available at* https://perma.cc/8TLH-G7ZL. The Star Ratings for a particular year are typically based on data from a period two years prior to the Star Ratings period. For example, the 2025 Star Ratings were calculated based mostly on 2023 measurement year data; the 2026 Star Ratings were based mostly on 2024 measurement year data. *See, e.g.*, 2026 Star Rating Methodologies, *available at* https://perma.cc/KWB8-VLWK, at 112-114.

Contracts with higher Star Ratings are entitled to receive two kinds of adjustments to their capitated per-beneficiary base payment. First, Medicare Advantage organizations that receive sufficiently high Star Ratings also receive an increase in their benchmark for the following year's bid. *See* 42 U.S.C. § 1395w-23(o)(1) (increasing, for qualifying plans, the applicable percentage that calculates the benchmark); *id.* § 1395w-23(o)(3)(A)(i) (a qualifying plan is one that earns a rating of four stars or higher). This in turn can allow a Medicare Advantage plan to increase its

bid, receive higher rebates, or lower premiums. *See id.* § 1395w-24(b)(1)(C); 42 C.F.R. § 422.260. Second, plans with higher Star Ratings receive a higher share of their rebate, which they must use to fund supplemental health care benefits, reduce cost-sharing, or reduce plan premiums for beneficiaries. 42 U.S.C. § 1395w-24(b)(I)(C); 42 C.F.R. §§ 422.260, 422.266. Collectively, the increased benchmark and increased rebates available to plans with higher Star Ratings are referred to as "quality bonus payments."

Each year in late May or early June, MAOs submit bids to CMS describing the plans they propose to offer to beneficiaries in the following year. These bids include a detailed description of how each contract will allocate its quality bonus payments—MAOs must inform CMS in advance what (if any) supplemental health care benefits they will offer, how (if at all) they will use quality bonus payments to reduce cost-sharing, and how (if at all) quality bonus payments will flow to reduced plan premiums.

## II. <u>Factual Background and Procedural History</u>

### A. 2026 Star Ratings Litigation

On October 9, 2025, CMS published 2026 Medicare Advantage Star Ratings on the Medicare Plan Finder. *Clover Ins. Co. v. U.S. Dep't of Health & Human Servs.*, No. 2:25-CV-142, 2026 WL 1483515 (S.D. Ga. May 27, 2026), at *5. On November 7, 2025, a single Medicare Advantage Organization ("MAO")—Clover Insurance Company—filed suit in the District Court for the Southern District of Georgia, asserting that CMS had calculated its Star Rating using measures that were, for various reasons, unlawful. *Id.* at 6. On May 27, 2026, that court granted partial summary judgment to Clover, holding that CMS had unlawfully applied twenty Star Ratings measures to it. *See id.* at *14, *22. The court held that ten of these measures were not promulgated by regulation as required by 42 U.S.C. § 1395hh(a)(2), setting aside Clover's 2026 Star Rating and ordering CMS to recalculate that rating in a manner consistent with the Court's

order. *Id.* at *14, *22, *25. Defendants moved for reconsideration, which the court denied on May 29, 2026. *Clover Ins. Co. v. U.S. Dep't of Health & Human Servs.*, No. 2:25-CV-142, 2026 WL 1510382 (S.D. Ga. May 29, 2026), at *5.

On June 17, 2026, CMS announced that it was "voluntarily recalculating the 2027 Quality Bonus Payment (QBP) ratings for certain Medicare Advantage (MA) contracts." CMS, HPMS Memo, Update to 2027 Quality Bonus Payment Determinations, June 17, 2026, *available at* https://www.cms.gov/about-cms/information-systems/hpms/hpms-memos-archive-weekly/hpms-memos-wk-3-june-15-19. The memorandum referenced the *Clover* court's decision, but explicitly noted that CMS's decision to recalculate "has no bearing on CMS's potential exercise of its right to appeal this decision." *Id.* at n.1. Under the memorandum, CMS recalculated Star Ratings using only measures that incorporated data collected under a statutory provision, 42 U.S.C. § 1395w-22(e), that governs quality improvement plans. *Id.* For each contract, it compared the recalculated score to the original score. Only contracts that had a rating increase that resulted in improved Quality Bonus Payment eligibility status as a result of the recalculation could submit revised bids. *Id.* On July 22, 2026, the government filed a notice of appeal of the court's decision in *Clover*.

**B. SCAN's 2026 Star Rating and This Lawsuit**

SCAN's 2026 overall Star Ratings for contracts H5425 and H0976 were 4 stars. On July 7, 2026, following the *Clover* decision, SCAN brought this lawsuit. SCAN argues that ten of the Star Ratings measure specifications applied to it[2] for the 2026 Star Ratings are illegal, arguing that they were required to be adopted as regulations in the Code of Federal Regulations through notice-

[2] There are 33 Part C measures in the 2026 Star Ratings, but three of them (C07, C08, and C09) are "Special Needs Plan" only measures that do not apply to SCAN because it is not a Special Needs Plan.

and-comment rulemaking under 42 U.S.C. § 1395hh(a)(2).[3] Plaintiff's Memo. In Support of Mot. Summ. J. ("Pl.'s Br.") at 18-19. SCAN contends that the ten challenged Star Rating measures and their specifications amount to a "rule, requirement, or other statement of policy" and that each establishes "a substantive legal standard" under § 1395hh(a)(2). *Id.* SCAN claims that the ten challenged Star Rating measures and their specifications govern the scope of benefits, the payment for services, and the eligibility of entities and organizations to furnish Medicare services and benefits and consequently, must have been promulgated through notice-and-comment rulemaking. *Id.*

**STANDARD OF REVIEW**

In this action under the Medicare statute, judicial review is governed by the standards of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, and decided on an administrative record. *Se. Ala. Med. Ctr. v. Sebelius*, 572 F.3d 912, 916-17 (D.C. Cir. 2009). Accordingly, "'the district court does not perform its normal role' but instead 'sits as an appellate tribunal'" resolving legal questions. *County of Los Angeles v. Shalala*, 192 F.3d 1005, 1011 (D.C. Cir. 1999) (quoting *PPG Indus., Inc. v. United States*, 52 F.3d 363, 365 (D.C. Cir. 1995)). Although the parties move for summary judgment, the "standard set forth in Rule 56(c) . . . does not apply." *Gentiva Healthcare Corp. v. Sebelius*, 857 F. Supp. 2d 1, 6 (D.D.C. 2012), *aff'd*, 723 F.3d 292 (D.C. Cir. 2013). Rather, summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Id.* The APA provides for courts to "hold unlawful and set aside

---

[3] The ten measures SCAN challenges are: Annual Flu Vaccine (C03), Improving or Maintaining Physical Health (C04), Improving or Maintaining Mental Health (C05), Reducing the Risk of Falling (C15), Improving Bladder Control (C16), Getting Needed Care (C22), Getting Appointments and Care Quickly (C23), Customer Service (C24), Rating of Health Care Quality (C25), and Care Coordination (C27).

agency action, findings, and conclusions" if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C), or "without observance of procedure required by law," *id.* § 706(2)(D).

## ARGUMENT

### I. SCAN's Claims As They Pertain to Contract H0976 Should be Dismissed for Lack of Subject-Matter Jurisdiction.

This Court should dismiss SCAN's claims as they pertain to contract H0976 for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) because SCAN has no standing to assert those claims.

A plaintiff who seeks to establish Article III standing "bears the burden of establishing" that it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). These elements "are not mere pleading requirements but rather an indispensable part of the plaintiff's case." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). As always, "the plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements." *Spokeo*, 578 U.S. at 338. SCAN, for its claims as they pertain to contract H0976, does not meet this burden.

#### A. Injury in Fact

SCAN cannot show that it was injured by CMS's failure to eliminate the ten challenged measures in calculating its 2026 Star Rating of H0976 because its Star Rating would remain 4.0 stars even if those measures were eliminated. To establish standing, an injury in fact must be concrete. "A concrete injury must be *de facto*; that is, it must actually exist," and not be "conjectural or hypothetical." *Spokeo*, 578 U.S. at 339-40; *see also Owner-Operator Indep.*

*Drivers Ass'n, Inc. v. Dep't of Transp.*, 879 F.3d 339, 342 (D.C. Cir. 2018) (holding that plaintiffs challenging "the mere existence" of purportedly "inaccurate information" about them in state database lacked injury in fact). "[M]ere conclusory allegations do not suffice" to show an injury in fact. *Air Excursions LLC v. Yellen*, 66 F.4th 272, 277 (D.C. Cir. 2023). SCAN fails to meet this standard.

SCAN's theories of harm flow from its mistaken hypothesis that, if CMS calculates its contracts' 2026 Star Ratings by excluding the ten measures subject to the *Clover* court's notice-and-comment conclusion, its 2026 Star Rating for contract H0976 will increase. Specifically, SCAN contends that it "would have received overall 2026 Star Ratings of 4.5 stars, rather than 4 stars, and would have been eligible for an approximate $125 million in additional rebates for the 2027 plan year." Pl.'s Br. at 3. But SCAN is not entitled to additional QBPs with regard to H0976 because if CMS excludes the twenty measures challenged in *Clover*, its Star Rating would stay the same: 4.0 Stars. *See* Exhibit 1, Goldstein Declaration ("Goldstein Dec.") ¶ 5. There is no permutation of measures that would increase the contract H0976's Star Rating to 4.5 Stars. *Id.*

SCAN makes a single conclusory statement theorizing that its contracts' Star Ratings would increase: "Were CMS to remove the above-identified measures from SCAN's 2026 Star Rating and recalculate it without the inclusion of those measures, SCAN would achieve a 2026 Star Rating in excess of 4 Stars (namely, 4.5 Stars) for its plans H5425 and H0976." Pl.'s Br. Ex. 1, ¶ 63. SCAN fails to offer any further evidence in support of its calculation. SCAN's failure to allege facts that a harm is "actual and imminent, not conjectural or hypothetical," are fatal to its claim with regard to H0976. *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).

SCAN alleges that CMS violated the APA by calculating its Star Ratings using measures that were not adopted through notice-and-comment rulemaking. A statutory violation, however, is

not itself an injury in fact. For example, in *TransUnion LLC v. Ramirez*, the Supreme Court held that the improper designation of the plaintiffs on a sanctions list in the consumer reporting agency's internal files, allegedly in violation of the Fair Credit Reporting Act, did not by itself confer standing. 594 U.S. 413, 433 (2021). So, too, here. Stand-alone allegations that Defendants violated the APA do not amount to concrete injuries sufficient to support standing.

In sum, SCAN must show that any entitlement to "substantial additional QBPs over the course of 2027" allowing it to compete more competitively in the Medicare Advantage marketplace actually exists. *See Spokeo*, 578 U.S. at 339-40. To do so, it would have to show that its preferred Star Ratings calculation methodology would result in H0976 receiving a higher Star Rating. SCAN has not met this burden.

### B. Redressability

Likewise, SCAN does not show how the court can redress its alleged injury. To satisfy Article III's redressability requirement, "[i]t must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (internal quotation marks omitted). SCAN cannot make that showing with regard to H0976 because under its preferred Star Ratings calculation methodology, H0976's Star Rating remains the same. *See* Goldstein Dec. ¶¶ 4-5. Consequently, the relief SCAN seeks from this Court with regard to contract H0976 will not redress SCAN's alleged injury. Because under its preferred measure formulation H0976 would remain at 4 stars, a redetermination of QBPs would not make SCAN any better off. Goldstein Dec. ¶ 5. For these reasons, SCAN has failed to establish standing as to contract H0976.

## II. The Medicare Advantage Star Ratings Measure Specifications Do Not Violate the Medicare Statute's Rulemaking Provision.

SCAN contends that CMS's method of determining the amount of its quality bonus payments through Star Ratings measure specifications violates the Medicare statute because those

specifications were not established "by regulation." There is no basis in law or precedent for this claim, which (if this Court adopts it) would undermine all of the existing Star Ratings measure specifications that underly all quality bonus payments *to all MAOs.*

### A. The Medicare Statute Does Not Require Notice-and-Comment Rulemaking for Star Ratings Measures.

While the Medicare statute requires that CMS effectuate certain agency actions "by regulation," 42 U.S.C. § 1395hh(a)(2), this requirement does not apply to Star Ratings measure specifications. The Medicare rulemaking provision states:

> No rule, requirement, or other statement of policy . . . that establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under this subchapter shall take effect unless it is promulgated by the Secretary by regulation.

42 U.S.C. § 1395hh(a)(2).

As one district court has already held when addressing whether § 1395hh(a)(2) requires notice and comment on Star Ratings measure specifications, the statute applies to rules, regulations, or statements of policy that "govern[]." *Humana Inc. v. U.S. Dep't of Health & Hum. Servs.*, 806 F. Supp. 3d 642, 648 (N.D. Tex. 2025)*, appeal docketed,* No. 25-11302 (5th Cir.). And to "'govern' means 'to prevail or have decisive influence; control.'" *Id.* (citing Merriam Webster); *see also* Black's Law Dictionary (12th ed. 2024) (defining "govern" as "to control a point in issue"). As that court held, the Star Ratings measure specifications do not "have decisive influence" or "control" over the "payment for services" because "quality bonus payments and rebates are not 'payment for services.'" *Humana*, 806 F. Supp. 3d at 648. Nor do Star Ratings measure specifications control the eligibility to "furnish or receive services or benefits" under the Medicare statute because CMS's ability to exclude consistently low-performing plans is discretionary. *Id.* at 647.

SCAN, without acknowledging this decision, presses three theories for why CMS was required to promulgate the Star Ratings measure specifications by regulation, arguing in turn that they govern "the payment for services," "eligibility to furnish services or benefits," and "the scope of benefits." Br. at 56-58. None has merit.

**1. Star Ratings measure specifications do not govern the payment for services.**

"Payment for services" as used in the Medicare statute refers to the amounts paid to the providers of medical services in exchange for furnishing medical care to beneficiaries. The statutory text makes that clear. The Medicare statute defines various types of "services" in its general definitions provision, and those definitions uniformly use "services" to refer to medical services provided by a hospital or other medical care provider. *See, e.g.*, 42 U.S.C. § 1395x(a) (referring to access to "hospital services" or "extended care services"); § 1395x(b) (referring to "services furnished to an inpatient of a hospital"); § 1395x(k) (referring to "services furnished by" a hospital or nursing facility). Indeed, the statute defines a "provider of services" to mean "a hospital, critical access hospital, rural emergency hospital, skilled nursing facility, comprehensive outpatient rehabilitation facility, home health agency, hospice program." *Id.* § 1395x(u). Not included in that list is an insurance company or any other entity that pays others to provide services. That same understanding is reflected throughout the Medicare statute. *See, e.g.*, 42 U.S.C. § 1395w-22(a)(B)(i) (describing "services" as including chemotherapy, dialysis, skilled nursing care, clinical diagnostic laboratory tests, drugs). CMS regulations, too, have long defined "services" to refer exclusively to medical care. *See* 42 C.F.R. § 400.202 ("Services means medical care services or items").

Similarly, courts (other than the *Clover* district court) have consistently understood that "payment for services" refers to the amounts Medicare pays healthcare providers in exchange for furnishing covered medical services to patients. *See, e.g.*, *Azar v. Allina Health Servs.*, 587 U.S.

566, 570 (2019) ("payment for services" covers payments "the federal government has paid hospitals directly for providing covered patient care"); *Humana*, 806 F. Supp. 3d at 648 ("payments for services refers to the amounts Medicare must pay providers for furnishing covered services").

Equally clear from the Medicare statute: "Services" are distinct from "benefits." In Medicare terminology, a benefit is the promise of coverage for the cost of medical services that is guaranteed to Medicare beneficiaries under the Medicare program, subject to cost-sharing. In Medicare Part C, a benefit can also be a "supplemental benefit" – insurance coverage like dental or vision, reduced premiums, or reduced cost-sharing. *See* 42 C.F.R. §§ 422.102, 422.266(b)(1). Congress frequently distinguishes between "services" and "benefits," including in 1395hh(a)(2) itself, which draws clear distinctions between actions governing "payment for services" and "the scope of benefits." 42 U.S.C. § 1395hh(a)(2). Numerous other provisions similarly use both terms in a way that demonstrates they are distinct, mutually exclusive categories. *See, e.g.*, 42 U.S.C. § 1395w-21(a) (beneficiaries can receive benefits either through "fee-for-service program under parts A and B" or through Medicare Advantage). And the "scope of benefits" under Medicare in turn, refers to "entitlement to have payment made" for specified "services." *See* 42 U.S.C. §§ 1395d, 1395k.

This distinction between "benefits"—referring to a guarantee by the insurer to cover certain medical expenses—and "services"—referring to the underlying medical services themselves—is well understood by the healthcare community, including health insurers. *See Medicare 101*, KFF, *available at* https://www.kff.org/medicare/health-policy-101-medicare/?entry=table-of-contents-what-is-medicare (distinguishing between benefits and services); *Medicare Advantage v. Original Medicare*, Humana, *available at* https://www.humana.com/medicare/medicare-

resources/original-medicare-vs-medicare-advantage (same); *What is Medicare*, Anthem, *available at* https://www.anthem.com/medicare/learn-about-medicare/what-is-medicare (same); *Medicare Advantage Plans That Fit Your Lifestyle*, SCAN, *available at* https://www.scanhealthplan.com/understanding-medicare/scan-65 (same). In short, "services" in the Medicare statute refers to medical care, not to medical insurance coverage.

SCAN offers no evidence that the Star Ratings measure specifications even affect—much less "govern[]"— "payment for services" under the Medicare statute. Those measure specifications have nothing to do with the amount providers of medical services are paid for covered services under Medicare. An MAO's Star Rating is wholly independent of its obligation to provide insurance benefits for Medicare-covered services on behalf of Medicare beneficiaries. Some plans do not receive quality bonus payments at all based on their Star Ratings, but they have the same statutory obligation as all other MAOs to provide "benefits under the original Medicare fee-for-service program option." 42 U.S.C. § 1395w-22(a)(1)(A); *see also* 42 U.S.C. § 1395w-22(a)(1)(B). The "monthly payments" that CMS pays to "*each* [Medicare Advantage] organization," 42 U.S.C. § 1395w-23(a)(1)(A) (emphasis added), are based on the capitation rate, which is established each year under the notice-and-comment process described in 42 U.S.C. § 1395w-23(b)(2). The capitation rate is meant to reflect what the government would expect to pay to providers for the services they furnish to a Medicare beneficiary under original Medicare. It is in no way linked to Star Ratings—and SCAN does not allege otherwise.

While quality bonus payments are linked to Star Ratings, they are not and do not govern "payments for services" for the same reason: a plan's obligation to pay for services on behalf of beneficiaries exists whether or not it receives quality bonus payments. In addition, the Medicare statute and regulations forbid MAOs from using quality bonus payments to pay for services. 42

U.S.C. § 1395w-24(b)(1)(C)(i); 42 C.F.R. 422.266(b). Instead, plans may use quality bonus payments to pay for supplemental health care benefits or reduce beneficiary premiums or cost-sharing. 42 C.F.R. § 422.266(b). Those supplemental benefits may not be "benefits under original Medicare." *Id.* at § 422.266(b)(1). The "scope of benefits" under Parts A and B, in turn, refers to "entitlement to have payment made" for specified "services." *See* 42 U.S.C. §§ 1395d, 1395k. "[P]ayments for services refers to the amounts Medicare must pay providers for furnishing covered services." *Humana*, 806 F. Supp. 3d at 648 (citing 42 U.S.C. §§ 1395w-22(a)[(1)](B)(iv) & 1395u). A quality bonus payment is not a payment from Medicare to any plan "for services," nor may it be used by the plan to pay for "services" as Medicare defines the term. *See* 42 U.S.C. § 1395x (Medicare statute definition of various types of "services"); *see also* 42 U.S.C. §§ 1395d, 1395k ("scope of benefits" under Parts A and B referring to "entitlement to have payment made" for specified "services"). The technical measure specifications underlying the Star Ratings that could result in a quality bonus payment cannot, therefore, govern the payment for services.

The *Clover* court's conclusion that the Star Ratings technical specifications must be promulgated through notice-and-comment rulemaking because they "govern . . . the payment for services" conflates CMS's payments to MAOs for providing insurance coverage with actual payment for medical care. *See Clover Ins. Co. v. U.S. Dep't of Health & Hum. Servs.*, No. 2:25-CV-142, 2026 WL 1483515, at *24 (S.D. Ga. May 27, 2026) ("limiting 'payment for services' to only payments by MAOs for beneficiaries' healthcare services is an unduly narrow interpretation of this phrase"). As explained, the text and structure of the Medicare statute foreclose the conclusion that "payment for services" means payments to MAOs for providing insurance coverage. Congress distinguishes between "services" and "benefits," including in 1395hh(a)(2) itself, which separately refers to eligibility "to furnish or receive services or benefits." Under

Medicare Part C, MAOs "provide . . . *benefits* under the original Medicare fee-for-service program option;" they do not furnish medical "services." 42 U.S.C. § 1395w-22(a)(1)(A) (emphasis added). The *Clover* court suggested that the "basic structure of the Medicare Advantage program" supports that view, citing the Eleventh Circuit's general discussion of the Medicare Advantage program in *MSP Recovery Claims v. Metropolitan Gen. Ins. Co.*, 40 F.4th 1295, 1298 (11th Cir. 2022). *Clover Ins. Co.*, 2026 WL 1483515, at *24. But *MSP Recovery* only confirms the error described at length above: That decision contrasts traditional Medicare, a "fee-for-*services*" scheme under which CMS "pay[s] providers directly for [beneficiaries'] medical care," with Medicare Advantage, where a "private insurer of the enrollee's choice provide Medicare *benefits*." 40 F.4th at 1298.

It is of no import that MAOs bear financial risks if their payments to providers exceed CMS's payments. *See* Pl.'s Br. at 25. A plan that receives quality bonus payments commits, before the relevant plan year even starts, to how it will use the extra payments. 42 C.F.R. §§ 422.254(d), 422.266(b). An MAO must describe in its bid how it will use whatever quality bonus payment it receives for a supplemental benefit like dental coverage or lowered premiums, which is then reflected in marketing materials for beneficiaries in advance of the plan year. *See id.* §§ 422.254(d), 422.2263(a). If an MAO spends more on services than it expected to, it is prohibited from recouping that difference mid-year by redirecting its quality bonus payment or cancelling the supplemental benefits of enrollees on the grounds that the plan needed that money to stay profitable. *See id.* § 422.254(a)(5).

Similarly, the Medical Loss Ratio is irrelevant. SCAN asserts that "[a]s plan revenues increase through Star-Rating driven payments, more funds must be spent on healthcare services to meet the [Medicare Loss Ratio]." Pl.'s Br. at 26. This is wrong. A plan that fails to meet the

statutory minimum loss ratio of .85 does not make extra payments to providers; it must "remit to the Secretary" a sum of money equal to the product of its total revenue and the difference between .85 and its medical loss ratio. 42 U.S.C. § 1395w-27(e)(4). SCAN presents no evidence that any Medicare Advantage plan increases payments to providers if it believes it may be below the .85 Medical Loss Ratio threshold for a plan year, and even if one did, such a policy would be a decision by the plan and not evidence that its Star Rating somehow "governs" the "payment for services."

In sum, the technical specifications for Star Ratings measures do not alter an MAO's obligation to pay for Medicare-covered medical care. MAOs have the same obligation to provide insurance coverage—for medical care on behalf of beneficiaries enrolled in their plans regardless of their quality bonus payments from Star Ratings. A three-star plan that receives no quality bonus payments has the same obligation to pay for Medicare-covered items and services as a five-star plan. Therefore, although Medicare Advantage plans pay for Medicare benefits, those benefits are unaffected by Star Ratings. Plans must use quality bonus payments to either reduce premiums, reduce cost-sharing, or offer benefits *not* covered by Medicare, like dental and vision insurance coverage. Because those payments cannot be used to pay for Medicare-covered services, Quality Bonus Payments do not govern "payment for services" as the Medicare statute uses that term. In short, "quality bonus payments and rebates are not 'payments for services'" and "the Star Ratings do not affect 'payment for services,'" much less govern them. *Humana*, 806 F. Supp. 3d at 648. SCAN's arguments to the contrary are meritless.

**2. Star Ratings measure specifications do not govern eligibility to furnish services or benefits.**

Likewise, Star Ratings do not govern eligibility to furnish services or benefits under § 1395hh. The district court in *Humana* rejected the same argument SCAN makes here: that the Star Ratings govern eligibility because "CMS *may* terminate plans from the Medicare Advantage

program if they . . . fail to achieve an overall Star Rating of at least 3 Stars over three years." Pl.'s Br. at 27 (emphasis added); *see Humana*, 806 F. Supp. 3d at 648. As SCAN acknowledges, the regulation *allows*, but does not *require*, CMS to terminate persistently low-performing plans. *See* 42 C.F.R. § 422.510(a)(4)(xi); *see also HMO La., Inc. v. HHS*, 793 F. Supp. 3d 150, 153 (D.D.C. 2025) ("If a plan's star ratings drop too low, CMS may terminate it from the MA program altogether."). It thus does not "govern" eligibility because its influence is not "decisive." *See Humana*, 806 F. Supp. 3d at 648. That CMS continues to have discretion as to whether to terminate a plan that achieves persistently low Star Ratings shows that the Star Ratings do not "govern" eligibility.

**3. Star Ratings measure specifications do not govern the scope of benefits.**

MAOs may choose to offer supplemental benefits to beneficiaries regardless of their Star Ratings. The Star Ratings therefore do not "govern" the scope of benefits. Plans are statutorily obligated to provide the same benefits as original Medicare, 42 U.S.C. § 1395w-22(a)(1)(A), and each plan "may provide to individuals enrolled under this part . . . supplemental health care benefits that the Secretary may approve," 42 U.S.C. § 1395w-22(a)(3). These provisions do not depend at all on the Star Ratings.

SCAN's position appears to be that if it received more quality bonus payments, it would choose to offer more supplemental benefits. *See* Pl's. Br. at 27-28. But that does not mean that the Star Ratings "govern" the "'scope of benefits' that SCAN may offer," *id.* at 28—SCAN can offer whatever supplemental benefits it wants, regardless of its Star Rating, as long as the Secretary has approved them (which he "shall" unless he determines that approving them would "substantially discourage enrollment," 42 U.S.C. § 1395w-22(a)(3)(A)). That, as SCAN claims, it is less economical for it to offer these benefits because its Star Rating means lower quality bonus payments is wholly separate from whether the Star Ratings "govern" the "scope of benefits."

SCAN's theory fails for a second, independent reason. In the statutory provision discussed above, Congress instructed the Secretary to "approve any such supplemental benefits" that does not "substantially discourage enrollment." 42 U.S.C. § 1395w-22(a)(3). In that instruction, there is no requirement or indication that the Secretary must approve such supplemental benefits "by regulation." SCAN presents no evidence that the Secretary's approval of supplemental benefits must be "by regulation" under Section 1395hh(a)(2). The fact that Congress instructed the Secretary to approve supplemental benefits without needing to act "by regulation" indicates that Congress did not consider the provision of supplemental benefits by MAOs to be among the "scope of benefits" described in § 1395hh(a)(2).

### B. SCAN's interpretation of § 1395hh(a)(2) creates an unnecessary conflict with another Medicare provision, § 1395w-23(b).

SCAN's expansive reading of § 1395hh(a)(2) also creates an avoidable conflict with 42 U.S.C. § 1395w-23(b). If SCAN's argument that quality bonus payments are payments for services were accepted, it would necessarily follow that the risk-adjusted Medicare Advantage capitation rate—the amount the government pays each Medicare Advantage plan for each enrollee—could also be said to govern the "payment for services" and therefore be subject to § 1395hh(a)(2). After all, that capitated payment is meant to reflect what the government would expect to pay to providers for the services they furnish to the Medicare beneficiary.

But the annual capitation rate is not subject to the requirement in § 1395hh(a)(2) that the Secretary act "by regulation." Instead, Congress established a separate notice-and-comment provision specific to the Medicare Advantage "annual announcement of payment rates." 42 U.S.C. § 1395w-23(b), (b)(2). When setting capitation rates, the agency is required to notify MAOs and give them an opportunity to comment, but the statute does not require action "by regulation" in the way § 1395hh(a)(2) does. 42 U.S.C. § 1395w-23(b). Under SCAN's sweeping interpretation

of § 1395hh(a)(2), it is difficult to see how capitation rates would not also be required to be set "by regulation" under 1395hh(a)(2), which would render the specific notice-and-comment provision of 1395w-23(b) meaningless. "If a provision is susceptible of (1) a meaning . . . that deprives another provision of all independent effect, and (2) another meaning that leaves both provisions with some independent operation, the latter should be preferred." A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 176 (2012); *see also Corley v. United States*, 556 U.S. 303, 314 (2009) (describing the canon that statutes should be construed to give effect to all their provisions, so that no part is inoperative or superfluous). Had Congress thought the capitation rate was subject to the regulation requirements of § 1395hh(a)(2), it would not have needed to add § 1395w-23(b). SCAN's reading of § 1395hh(a)(2) thus creates an avoidable conflict between two sections of the Medicare statute. The government's reading properly avoids any such conflict.

**C. SCAN's position would make the Star Ratings unworkable.**

SCAN's position would also make a key part of calculating each plan's Star Rating unworkable. Each year, some of the Star Ratings measure specifications include case-mix adjustments. *See* 2026 Technical Notes, https://www.cms.gov/files/document/2026-star-ratings-technical-notes.pdf. CMS presents these case-mix adjustments via tables in the annual Star Ratings Technical Notes, and it bases the coefficients on statistical analysis of *that year's data*. *See id.* Without coefficients, it would be impossible to apply a case-mix adjustment to the measures that require it—but there is no way for CMS to calculate these coefficients in advance, as would be required if the detailed specifications for Star Ratings measures had to be codified in regulation. A requirement that CMS codify in the Code of Federal Regulations every detail of the

measure specifications, such as the details of the case-mix adjustment, would make calculating a plan's Star Rating unworkable.[4]

## III. <u>Any Relief Should be Appropriately Limited</u>

For the reasons already described, SCAN cannot show that the Star Ratings measure specifications fall within the ambit of § 1395hh(a)(2). If this Court disagrees with the government's arguments, however, it should remand to the agency to recalculate SCAN's Star Rating consistent with the Court's opinion. If the Court is not inclined to remand the matter to the agency, the court should not entertain SCAN's attempt to handpick measures for invalidation. There is simply no principled basis on which to limit SCAN's arguments to only the measures it identifies.

### A. Remand Is the Appropriate Remedy.

If the Court agrees that the ten measures SCAN challenges violate the Medicare statute's notice-and-comment requirements, it should remand to the agency. "[T]he better course when an agency error is identified is for the reviewing court, except in rare circumstances, to remand to the agency for additional investigation or explanation" consistent with its ruling. *FDA v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 587 (2025) (cleaned up); *N.C. Fisheries Ass'n, Inc. v. Gutierrez*, 550 F.3d 16, 20 (D.C. Cir. 2008). That is the normal practice because, "[u]nder settled principles of administrative law, when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action consistent with the corrected legal standards." *PPG Indus., Inc. v. United States*, 52

---

[4] To be sure, CMS does provide a process for stakeholder input. It conducted notice-and-comment rulemaking on the then-existing measures in 2018. *See* 83 Fed. Reg. at 16547-62. Through that rulemaking, it implemented the process described in regulation at 42 C.F.R. § 422.164, which allows MAOs to participate in the ongoing development of the Star Ratings system and provide input on updates to measure specifications through notice-and-comment processes.

F.3d 363, 365 (D.C. Cir. 1995). For that reason, the D.C. Circuit has reversed a district court that "required the Secretary to affirmatively count Part C days under the Medicaid fraction" on remand, explaining that the district "court erred by directing the Secretary how to calculate the hospitals' reimbursements, rather than just remanding after identifying the error." *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1111 (D.C. Cir. 2014).

"Only in extraordinary circumstances do [courts] issue detailed remedial orders," such as the one that SCAN requests here. *N.C. Fisheries Ass'n*, 550 F.3d at 20; *accord In re Long-Distance Tel. Serv. Fed. Excise Tax Refund Litig.*, 751 F.3d 629, 634 (D.C. Cir. 2014). SCAN contends that this case presents extraordinary circumstances justifying a detailed remedial order. Not so. SCAN predicates its relief request on its perceived doubt as to CMS's "willingness to comply with the statute and operationally facilitate mandatory rebate relief." Pl.'s Br. at 31. SCAN appears to conflate CMS's representation that it cannot reopen the Medicare Advantage bid process at this late date ahead of CMS's imminent annual open enrollment period with a representation that it would not afford SCAN appropriate rebate relief consistent with a court order. If required to, CMS would afford SCAN appropriate rebate relief. As CMS represented, implementing such unprecedented relief would be "complex[]." Tr. of July 29, 2026 Status Conf. at 3:15-17; 10:21-23. This is precisely why remand to CMS would be appropriate. In addition, such an instruction would "'intrude upon the domain which Congress . . . exclusively entrusted to an administrative agency.'" *Wages and White Lion Invs.*, 604 U.S. at 587 (quoting *SEC v. Chenery*, 318 U.S. 80, 88 (1943)). CMS's expertise better positions it to address the question in the first instance on remand.

**B. SCAN's Argument Is Not Limited to the Measures It Challenges.**

SCAN challenges only the ten measures that the *Clover* court identified as procedurally invalid. Pl.'s Br. at 18-19 n.6. While all measures applicable to SCAN for 2026 were implemented

through notice-and-comment rulemaking, *none* of the *specifications* for those measures are codified in the Code of Federal Regulations. *See* 83 Fed. Reg. at 16,537 ("CMS will not codify a list of measures and specifications in regulation text in light of the regular updates and revisions contemplated by the rules."). SCAN's lack of challenge to the other 32 measures on which its Star Rating is predicated implies that it believes CMS made no error in promulgating those measures. SCAN expects this Court to take it at its word that only the measures it challenges are flawed, but it provides no principled basis for distinguishing between the measures. SCAN cannot handpick measures to challenge based on its performance. If the Court agrees that the ten measures SCAN challenges violate the Medicare statute's notice-and-comment requirements, principles of equity require it to articulate some limiting principle. But SCAN offers none.

First, SCAN's requested relief granted runs afoul of basic rules of equity. Whenever a court issues injunctive relief, "traditional equitable principles" "presumpt[ively]" apply. *Starbuck Corp. v. McKinney*, 602 U.S. 339, 347-48 (2024). And it is a basic rule of equity that, when a court conducts an equitable inquiry, it must act "on a case-by-case basis," considering all relevant facts and circumstances. *Holland v. Florida*, 560 U.S. 631, 649–650, (2010). Here, relief limited to SCAN's ten handpicked measures disregards the disconnect between the nature of the wrong SCAN identified and the nature of the injunction it seeks. The result would be an order that bears no relationship with the legal errors SCAN alleges CMS has committed. Rather than holding unlawful and providing SCAN relief from the relevant agency decisions—*i.e.*, the decisions to adopt the 2026 Star Rating measures specifications without notice and comment—the court would set aside only the particular measures that SCAN handpicked while allowing it to retain the benefit of other measures that were equally infirm under its logic.

Further, "[c]ourts of equity can no more disregard statutory . . . requirements and provisions than can courts of law." *Armstrong v. Exceptional Child Ctr, Inc.*, 575 U.S. 320, 327-28 (2015). On SCAN's reasoning, it would have been unlawful for the agency in the first instance to calculate a Star Rating where all of the measures had been adopted without adherence to the proper procedures. This Court therefore could not require the agency to do so through injunctive relief. *See U.S. v. Coastal Refining and Marketing, Inc.*, 911 F.2d 1036, 1043 (5th Cir. 1990) ("A court in equity may not do that which the law forbids.").

The inequity of this result is especially pronounced here: SCAN requests an order requiring CMS to calculate and disseminate to millions of Medicare beneficiaries Star Ratings that, while purporting to provide an objective measure of plaintiff's plans, are based only on the metrics that SCAN handpicked after knowing how it had scored. Not only would that mislead consumers about the quality of plaintiff's plans, it also undercuts the comparative purposes of the entire Star Rating system, as SCAN alone would be allowed to choose the measures it wanted to be scored on after it knew all of its measure scores. For both reasons, this Court is not empowered to grant SCAN the injunctive relief it requests. *See Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 32 (2008) (explaining that "consideration of the public interest" is "pertinent in assessing the propriety of any injunctive relief"); *Di Giovanni v. Camden Fire Ins. Ass'n*, 296 U.S. 64, 73 (1935) (instructing that the "consequences of the court's grant of equitable relief" have "an important bearing on the exercise of the judicial discretion which must guide a court of equity in determining whether it should grant or withhold a remedy").

* * *

## CONCLUSION

For these reasons, the Court should grant Defendants' cross-motion for summary judgment and deny Plaintiff's motion for summary judgment.

Dated: August 28, 2026

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

By: *　　　/s/ William Thanhauser*
WILLIAM THANHAUSER
D.C. Bar #1737034
Assistant United States Attorney
601 D Street, NW
Washington, DC 20530
(202) 252-7706

*Attorneys for the United States of America*

*Of Counsel:*

MICHAEL B. STUART
General Counsel

ELIZABETH C. KELLEY
Deputy General Counsel
Chief Legal Officer for CMS

BETSY M. PELOVITZ
Associate General Counsel

MICHAEL J. GERARDI
Deputy Associate General Counsel for Litigation

KENNETH R. WHITLEY
Attorney
Department of Health and Human Services
Office of the General Counsel