**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

ALIGNMENT HEALTHCARE, INC., et al.,

*Plaintiffs*,

v.

DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al.,

*Defendants*.

Civil Action No. 1:26-cv-02441-CRC

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ iii

INTRODUCTION ........ 1

ARGUMENT ........ 5

- I. ALIGNMENT HAS STANDING TO MAINTAIN ITS CLAIM ON ITS CONTRACT NUMBER H4961 ........ 6
- II. CMS DETERMINED ALIGNMENT'S 2026 STAR RATINGS IN VIOLATION OF 42 U.S.C. § 1395HH(A)(2) ........ 12
  - A. The Measures Govern Payment For Services ........ 14
  - 1. Congress made clear that "payment for services" includes payments from CMS to plans for all services covered under the plans ........ 14
  - B. The Measures Govern Eligibility To Furnish Services And Benefits ........ 26
  - C. The Measures Govern The Scope Of Benefits ........ 29
  - D. CMS's Appeal To Policy Cannot Outweigh The Clear Text Of § 1395hh ........ 30
- III. THE COURT SHOULD VACATE ALIGNMENT'S 2026 STAR RATING, ORDER THE AGENCY TO RECALCULATE THAT RATING, AND REQUIRE CMS TO OPERATIONALLY FACILITATE MANDATORY REBATE RELIEF ........ 32

CONCLUSION ........ 37

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Biden*,
70 F.4th 817 (5th Cir. 2023) ....................27

*Adirondack Med. Ctr. v. Sebelius*,
740 F.3d 692 (D.C. Cir. 2014) ....................23, 25, 26

*Air Transp. Ass'n of Am., Inc. v. U.S. Dep't of Agric.*,
37 F.4th 667 (D.C. Cir. 2022) ....................22

*Am. Hosp. Ass'n v. Bowen*,
834 F.2d 1037 (D.C. Cir. 1987) ....................27

**Azar v. Allina Health Servs.*,
587 U.S. 566 (2019) .................... *passim*

*Bais Yaakov of Spring Valley v. FCC*,
852 F.3d 1078 (D.C. Cir. 2017) ....................31

*Bland v. New York*,
263 F. Supp. 2d 526 (E.D.N.Y. 2003) ....................29

*Brock v. Cathedral Bluffs Shale Oil Co.*,
796 F.2d 533 (D.C. Cir. 1986) ....................27

*Carpenters Indus. Council v. Zinke*,
854 F.3d 1 (D.C. Cir. 2017) ....................9, 10

*Changji Esquel Textile Co. v. Raimondo*,
40 F.4th 716 (D.C. Cir. 2022) ....................22, 25

*Clarian Health W., LLC v. Hargan*,
878 F.3d 346 (D.C. Cir. 2017) ....................27

**Clover Ins. Co. v. U.S. Dep't of Health & Hum. Servs.*,
2:25-cv-142-LGW-BWC, 2026 WL 1483515 (S.D. Ga. May 27, 2026) .................... *passim*

*Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.*,
901 F.2d 107 (D.C. Cir. 1990) ....................2, 8, 10

*Davis v. Fed. Election Comm'n*,
554 U.S. 724 (2008) ....................8

*Duncan v. Walker*,
533 U.S. 167 (2001)....................28

*Eagle Pharms., Inc. v. Azar*,
952 F.3d 323 (D.C. Cir. 2020)....................31

*eBay Inc. v. MercExchange, L.L.C.*,
547 U.S. 388 (2006)....................33

*Elevance Health, Inc. v. Becerra*,
736 F. Supp. 3d 1 (D.D.C. 2024) (Moss, J.)....................11, 19

*Elevance Health, Inc. v. Dep't of Health & Hum. Servs.*,
No. 2:26-cv-61, 2026 WL 2531796 (S.D. Ga. Aug. 27, 2026)....................1, 9, 11

*Erwin v. Fed. Aviation Admin.*,
23 F.4th 999 (D.C. Cir. 2022)....................2, 9

*Fed. Election Comm'n v. Akins*,
524 U.S. 11 (1998)....................9, 10

*Foretich v. United States*,
351 F.3d 1198 (D.C. Cir. 2003)....................12

*Fox v. Gov't of D.C.*,
794 F.3d 25 (D.C. Cir. 2015)....................14

*Friends of Earth, Inc. v. EPA*,
446 F.3d 140 (D.C. Cir. 2006)....................31

*Georgetown Univ. Hosp. v. Bowen*,
821 F.2d 750 (D.C. Cir. 1987)....................30

*Glob. Rescue Jets, LLC v. Kaiser Found. Health Plan, Inc.*,
30 F.4th 905 (9th Cir. 2022)....................18

*HMO La., Inc. v. HHS*,
179 F.4th 62 (D.C. Cir. 2026)....................18

*HMO La., Inc. v. HHS*,
793 F. Supp. 3d 150 (D.D.C. 2025)....................14, 15, 18, 19

*Humana Inc. v. U.S. Dep't of Health & Hum. Servs.*,
806 F. Supp. 3d 642 (N.D. Tex. 2025)....................21, 28

*In re Long-Distance Tel. Serv. Fed. Excise Tax Refund Litig.*,
751 F.3d 629 (D.C. Cir. 2014)....................34

*Koretoff v. Vilsack*,
707 F.3d 394 (D.C. Cir. 2013) .....35

*Maples v. State*,
968 N.W.2d 446 (Mich. 2021) .....29

*McBryde v. Comm. to Rev. Cir. Council Conduct & Disability Ords. of Jud. Conf. of U.S.*,
264 F.3d 52 (D.C. Cir. 2001) .....12

*Nat'l Wildlife Fed'n v. Hodel*,
839 F.2d 694 (D.C. Cir. 1988) .....10

*Pac. Gas & Elec. Co. v. Fed. Power Comm'n*,
506 F.2d 33 (D.C. Cir. 1974) .....28

*Saline Parents v. Garland*,
630 F. Supp. 3d 201 (D.D.C. 2022) .....9, 10

*SCAN Health Plan v. HHS*,
No. 1:23-cv-3910-CJN, 2024 WL 2815789 (D.D.C. June 3, 2024) .....11, 15, 19, 29

*Syncor International Corp. v. Shalala*,
127 F.3d 90 (D.C. Cir. 1997) .....27

*Teva Pharms. USA, Inc. v. Kennedy*,
No. 25-5425, -- F.4th --, 2026 WL 2409591 (D.C. Cir. Aug. 18, 2026) .....2, 9

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .....11

**Statutes**

42 U.S.C.
§ 1395d .....21
§ 1395hh ..... *passim*
§ 1395k .....21
§ 1395w-21 .....3, 16, 17, 21
§ 1395w-22 .....17, 21
§ 1395w-23 ..... *passim*
§ 1395w-24 ..... *passim*
§ 1395w-25 .....16
§ 1395w-27 .....20
§ 1395x .....21

**Regulations**

42 C.F.R.
§ 400.202 ..... 18
§ 422.2 ..... 18
§ 422.100 ..... 18
§ 422.160-66 ..... 32
§ 422.162 ..... 19
§ 422.164 ..... 32
§ 422.166 ..... 11
§ 422.254 ..... 30
§ 422.502 ..... 4, 26
§ 422.504 ..... 18
§ 422.510 ..... 4, 26
§ 423.182-86 ..... 32
§ 423.186 ..... 11
§ 423.509 ..... 26
§ 424.535 ..... 26
§ 489.53 ..... 26

88 Fed. Reg. 22,120 (Apr. 12, 2023) ..... 18

91 Fed. Reg. 17,384 (Apr. 6, 2026) ..... 18

**Other Authorities**

*Govern*, Black's L. Dictionary (6th ed. 1990) ..... 27

*Govern*, Webster's Dictionary Online, https://tinyurl.com/5xb5pwwp ..... 26, 29

*Govern*, Webster's New World College Dictionary (4th ed. 1999) ..... 26

## INTRODUCTION

The Centers for Medicare & Medicaid Services ("CMS") unlawfully calculated Alignment Healthcare, Inc.; Alignment Healthcare USA, LLC; Alignment Health Plan; and Alignment Health Plan of Arizona, Inc.'s (collectively, "Alignment") 2026 Star Ratings using 10 measures that it never promulgated by regulation, and nothing in CMS's Combined Cross-Motion and Opposition (Dkt. Nos. 18-19) ("CMS Br."), upsets that conclusion. Indeed, CMS largely recycles arguments already rejected in *Clover*, where the Southern District of Georgia held that these same measures could not lawfully be used to calculate 2026 Star Ratings. *Clover Ins. Co. v. U.S. Dep't of Health & Hum. Servs.*, 2:25-cv-142-LGW-BWC, 2026 WL 1483515, at *22-25 (S.D. Ga. May 27, 2026). It appears that a second plan, Elevance Health, Inc. (formerly Anthem), is likely to soon obtain similar relief.[1] CMS provides no reason for a different result here: As that court recognized, the text of 42 U.S.C. § 1395hh(a)(2) requires CMS to promulgate the 10 challenged Star Ratings measures "by regulation," and the statute's text resolves this case too.

At the outset, CMS does not contest Alignment's standing to maintain its challenge as to contract numbers H3815 or H3443, which account for the overwhelming majority of beneficiaries affected by the challenged Star Rating. Instead, CMS disputes standing only as to contract H4961, which accounts for a relatively small share of affected beneficiaries, arguing that removing the 10 challenged measures would not increase H4961's 2026 Star Rating from 4.0 to 4.5 Stars. But Alignment submitted sworn evidence establishing that it would do just that. Decl. of Dawn Maroney ("Maroney Decl.") ¶ 60, Dkt. No. 14-1. As best Alignment can discern (because CMS

---

[1] *See Elevance Health, Inc. v. Dep't of Health & Hum. Servs.*, No. 2:26-cv-61, 2026 WL 2531796, at *14 (S.D. Ga. Aug. 27, 2026) (denying motion for preliminary injunction but concluding that Elevance was likely to succeed on its claim on summary judgment that "ten disputed measures were unlawfully used in the Star Rating calculation because CMS did not engage in required notice-and-comment rulemaking as required by 42 U.S.C. § 1395hh(a)(2)").

does not explain how it arrives at its contrary result), CMS appears to be taking the position that, on remand, it would recalculate other components of Alignment's Star Ratings that are not challenged in this case. But standing does not turn on predictions about how an agency will act on remand or what result it will ultimately reach. *Erwin v. Fed. Aviation Admin.*, 23 F.4th 999, 1005-06 (D.C. Cir. 2022) (quoting *Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.*, 901 F.2d 107, 118 (D.C. Cir. 1990)); *Teva Pharms. USA, Inc. v. Kennedy*, No. 25-5425, -- F.4th --, 2026 WL 2409591, at *5-6 (D.C. Cir. Aug. 18, 2026) (holding that redressability did not depend on whether CMS would reach a different result on remand because vacatur would require the agency to proceed under the proper statutory interpretation). Redressability requires only that the requested relief be *likely* to redress Alignment's injury from an *unlawful 2026 Star Rating* calculated in a manner contrary to Congress's commands, not *certainty* as to the result CMS will reach on remand. *Id.*

And on the merits, the dispute is relatively narrow. CMS does not contest that the 10 challenged measures and the specifications to determine those measures are "rule[s], requirement[s], or other statements of policy" that establish "substantive legal standards" within the meaning of 42 U.S.C. § 1395hh(a)(2). *Azar v. Allina Health Servs.*, 587 U.S. 566, 579 (2019). CMS disputes (at 13-23) only whether those standards "govern" "payment for services," "eligibility . . . to furnish or receive services or benefits," or the "scope of benefits." 42 U.S.C. § 1395hh(a)(2).

CMS's argument is facially problematic. The measures that define the standards used to determine the Star Ratings in turn determine billions of dollars in Medicare Advantage payments, including the $50 million at issue in this suit. If Alignment prevails on its claims, it will undisputedly increase the Star Ratings for at least one contract and, as a result, be directly

statutorily entitled to $50 million in payments ("rebates"), which can then be used to fund member benefits, a point which CMS does not dispute. The Star Ratings measures also are determinative of CMS's authority to terminate low-performing plans, and they determine the scope of supplemental benefits by determining the funding available to fund those benefits. It is difficult to imagine a clearer or more direct case of substantive legal standards that "govern" payment for services, eligibility to furnish services or benefits, or the scope of benefits.

CMS nevertheless attempts to read these core aspects of Medicare Advantage out of 42 U.S.C. § 1395hh(a)(2). Start with the "payment for services." CMS attempts to import traditional Medicare's fee-for-service model into Part C (Medicare Advantage) and treat "payment for services" as limited to payments made *directly to healthcare providers*. But under Part C, CMS *pays health plans* to furnish beneficiaries' covered services. Congress expressly provided that the Medicare Advantage plan "receive[s] payments from the Secretary . . . for services furnished," 42 U.S.C. § 1395w-21(i)(2), and requires each plan to bid for the "provision of all items and services under the plan," *id.* § 1395w-24(a)(6)(A)(i). Star Ratings then directly determine the amount CMS pays plans for furnishing those services. Plans rated 4 Stars or higher receive an increased benchmark under 42 U.S.C. § 1395w-23(o), and higher-rated plans receive a greater rebate percentage under § 1395w-24(b)(1)(C). So the challenged measure specifications determine a plan's Star Rating; the Star Rating determines the benchmark and rebate percentages used to calculate its payment; and CMS makes that payment to the plan for services furnished to Medicare beneficiaries. Those standards "govern[] . . . payment for services" within the plain meaning of § 1395hh(a)(2).

CMS likewise attempts to read out of § 1395hh(a)(2) the standards Part C uses to determine whether a plan remains eligible to "furnish . . . services or benefits." 42 U.S.C. § 1395hh(a)(2).

CMS may terminate plans that fail to meet specified Star Rating thresholds from the Medicare Advantage program. 42 C.F.R. §§ 422.510(a)(4)(xi), 422.502(b)(1)(i)(D). Although CMS argues that the measures do not "govern" eligibility because CMS retains discretion whether to *actually* follow through and terminate a plan, "govern" means to supply a rule or legal standard, *not* to dictate the ultimate outcome. *Clover Ins. Co.*, 2026 WL 1483515, at *23; *infra* at 26-28. CMS's contrary position would exclude from § 1395hh(a)(2) the very standards Medicare *in general* uses to determine whether plans and providers may continue furnishing Medicare services and benefits.

The same is true for "scope of benefits." 42 U.S.C. § 1395hh(a)(2). CMS argues that Star Ratings do not govern that scope because plans remain free to choose which supplemental benefits to offer. But the statute expressly ties those benefits to plan revenues: a plan's bid must reflect its "revenue requirements" for providing benefits, and CMS may approve that bid only if it "reasonably and equitably reflects" those revenue requirements. 42 U.S.C. § 1395w-24(a)(6)(A), (B)(ii). Because Star Ratings determine the revenues available to fund supplemental benefits, they necessarily govern the scope of benefits a plan can offer. 42 U.S.C. § 1395hh(a)(2).

Turning from the merits to remedies, Alignment requested that the Court vacate Alignment's 2026 Star Ratings, order CMS to re-calculate them in accordance with the Court's opinion, and order CMS to take the predicate operational steps necessary to afford rebate relief, including facilitating the re-submission of any bid documents CMS deems operationally necessary to do so. Pl.'s Mot. for Expedited Summ. J. at 29-31 (Dkt. No. 13 "Alignment Br."). Alignment requested that relief because CMS has repeatedly cast doubt on whether it would afford Alignment the relief required by a judgment ordering recalculation of Alignment's 2026 Star Ratings. *Id.* In response, CMS asks that, if the Court finds the challenged measures unlawfully promulgated, it simply remand to the agency for recalculation of the Star Ratings "consistent with the Court's

opinion." CMS Br. 23. But CMS simultaneously argues that recalculation without the ten challenged measures would be impermissible, *despite having just undertaken that exact calculation for another plan, Clover*. *Id.* at 25-27. And after repeatedly casting doubt on whether it *could* afford rebate relief after the bidding deadline, CMS now promises only that, "[i]f *required*," it would provide "appropriate" rebate relief. *Id.* at 24 (emphasis added). CMS's continued equivocation over whether it will follow through and take the operational steps necessary to afford the rebate relief to Alignment required by the statute on remand confirms that remand alone is insufficient, and that CMS should be required to take the predicate operational steps necessary to afford rebate relief. CMS also does not meaningfully contest Alignment's showing that the equitable factors for permanent injunctive relief are satisfied. The Court should therefore enter a permanent injunction, requiring CMS to recalculate Alignment's Star Ratings and take the predicate operational steps necessary to afford rebate relief, including facilitating the re-submission of any bid documents CMS deems operationally necessary to do so.

For all these reasons and those that follow, Alignment respectfully requests that the Court grant Alignment's motion for summary judgment, deny CMS's cross-motion, set aside CMS's determination of Alignment's 4-star Star Ratings, order CMS to redetermine Alignment's 2026 Star Ratings in a manner consistent with this Court's decision, and order CMS to take the predicate operational steps necessary to afford rebate relief.

## ARGUMENT

CMS begins with a tail-wagging-the-dog argument to dismiss Alignment's claim to the extent it relates to contract number H4961, a contract that includes a relatively small proportion of the beneficiaries at issue in this suit; the overwhelming majority of beneficiaries are instead members of contract numbers H3815 and H3443. CMS's argument conflicts with established standing doctrine. Turning to the merits, CMS provides no persuasive basis to create an inter-

district-court split with the Southern District of Georgia's well-reasoned and highly persuasive opinion concluding that CMS applied the 10 challenged measures without required rulemaking, and they therefore cannot be applied in determining Alignment's 2026 Star Rating.

## I. ALIGNMENT HAS STANDING TO MAINTAIN ITS CLAIM ON ITS CONTRACT NUMBER H4961

CMS does not dispute that Alignment has standing to pursue this action, including for contract numbers H3815 and H3443, which encompass the overwhelming majority of beneficiaries affected by CMS's unlawful calculation of Alignment's 2026 Star Ratings. Instead, CMS raises a narrow argument directed only at contract number H4961: CMS contends (at 10-13) that Alignment lacks standing to challenge its calculation of *that* contract's Star Rating because, according to CMS, even if CMS excluded the 10 measures that Alignment requests, H4961's Star Rating would remain at 4.0 Stars, and so, CMS asserts, Alignment has suffered no injury that is redressable.

Recall that Alignment already submitted a sworn declaration from the President of Alignment Healthcare, Inc. and Chief Executive Officer of Alignment Health Plan, explaining that Alignment had already performed this exact mathematical analysis, and determined that recalculation of its 2026 Star Ratings without the 10 challenged measures would result in an increase in Alignment's overall 2026 Star Rating from 4.0 to 4.5 Stars for all of the challenged contracts. Maroney Decl. ¶¶ 53, 63. CMS does not challenge the veracity of that declaration as such: CMS does not dispute that the calculation was performed correctly using the available, public CMS data concerning the 2026 Star Ratings, in a manner consistent with CMS regulations, and that using that data to recalculate *would produce* a Star Rating of 4.5 Stars on remand.

While CMS fully accepts that the larger contracts (H3815 and H3443) would receive a 4.5 Star Rating on remand, for the smaller contract H4961, CMS raises a technical argument for

reliance on non-public, not-yet-produced CMS data, that has never been used for *any* Star Ratings calculation to date. The gist of CMS's argument, so far as is discernible,[2] is that there are certain components of the Star Ratings, known as the Categorical Adjustment Index ("CAI") and reward factor, that must be graded on a "curve" relative to other plans, on an apples-to-apples basis. *See* Decl. of Elizabeth H. Goldstein ¶¶ 6-9, *Elevance Health, Inc. v. U.S. Dep't of Health & Human Servs.*, No. 2:26-cv-00061 (S.D. Ga. Aug. 1, 2026), Dkt. No. 34-1 ("Elevance Goldstein Decl."). In effect, CMS contends that if it removes 10 measures for Alignment, it would need to remove the 10 measures for all other plans, *solely for purposes of determining Alignment's CAI and reward factor*, and grade Alignment on this "new" curve to determine a revised CAI and reward factor, *but would not apply that new curve to determine Star Ratings for other plans besides Alignment* (and SCAN and Elevance, which both have similar cases pending). *See id.* The upshot is that Alignment's 2026 Star Ratings would be recalculated using a *hypothetical* CAI and reward factor, not the existing CAI and reward factor determined based on existing, public data. *Id.* That is why CMS's and Alignment's declarants' calculations diverge.

The problem with CMS's argument is that it puts the cart far before the horse. CMS's argument is based on a chain of speculative possibilities. CMS's chain of reasoning is as follows: (1) following a remand, CMS would recalculate the 2026 Star Ratings in the manner predicted by CMS's Goldstein declaration, namely, using CMS's hypothetical, made-for-litigation, non-public

---

[2] CMS does not actually spell out how it arrives at this conclusion in its brief or through the submitted declaration. *See generally* CMS Br. 10-13; Decl. of Elizabeth H. Goldstein, Dkt. No. 17-1. Rather, the conclusion appears to follow from the numerical figures in CMS's declaration, which *do not match* with the public statistics that CMS has used to calculate all other plans' Star Ratings. The best that can be done to discern CMS's argument is to read these newfound numerical figures in light of the more detailed argument and declaration that CMS filed in *Elevance* for how it would perform a recalculation on remand without these 10 measures. *See* Elevance Goldstein Decl. ¶¶ 6-8, 24. In other words, although CMS does not *explain* what it has done here, as it did in *Elevance*, it appears from the data at issue that CMS did the same thing in both cases.

CAI and reward factor calculation; (2) CMS's undisclosed methodology and data for recalculating the CAI and reward factor are sound, *i.e.*, the calculation is mechanically correct, notwithstanding that those underlying, non-record calculations of the CAI and reward factor have not been produced in the record (or Ms. Goldstein's declaration) and therefore cannot be tested in this proceeding; (3) upon subsequent judicial review of that recalculated Star Rating, CMS would then produce a record that supports that the re-determination of its new, hypothetical CAI and reward factor are compliant with the governing statute, CMS's regulations, and CMS's guidance; and (4) the recalculation would be found to be compliant with governing law and non-arbitrary.

But the government cannot defeat a plaintiff's standing in an APA case by relying on a chain of speculative possibilities of what the agency might do on remand, including presuming that the agency's actions on remand are *per se* lawful and would survive judicial review. This is like a party saying, "Yes, the Challenged Rule authorizing the coal plant violates the statute, but on remand, hypothetically, we would alter the Rule to render it compliant and maintain the plant's authorization, so the challenger lacks standing, because the plant will still end up being built."

That violates black-letter standing law. To bring a claim in federal court, "a claimant must present an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged behavior; and likely to be redressed by a favorable ruling." *Davis v. Fed. Election Comm'n,* 554 U.S. 724, 733 (2008). Importantly, when relief hinges upon remand to a federal agency, courts recognize that "some uncertainty is inevitable." *Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.*, 901 F.2d 107, 118 (D.C. Cir. 1990). Plaintiffs therefore "need not prove that granting the requested relief is *certain* to redress their injury" on remand, which will ordinarily be an impossibility given the agency's discretion under the rules governing remand. *Id.* at 117-18 (emphasis added). Indeed, "[i]f a reviewing court agrees that the agency

misinterpreted the law, it will set aside the agency's action and remand the case—even though the agency (like a new jury after a mistrial) might later, in the exercise of its lawful discretion, reach the same result for a different reason." *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 25 (1998); *see also Erwin*, 23 F.4th at 1005; *Teva Pharms. USA, Inc.*, 2026 WL 2409591 (recognizing that challenger had standing, even though CMS might reach same result on remand).

Notably, CMS raised this *exact* argument to attempt to defeat standing for certain contracts at issue in the *Elevance* matter. But as the Southern District of Georgia recognized in *Elevance*, in rejecting that argument at the preliminary-injunction stage, CMS cannot defeat standing by asking a court to either predict what the agency will decide on remand, or to pre-judge the lawful methodology for recalculating Star Ratings on remand. *Elevance Health, Inc.*, 2026 WL 2531796, at *7. As the court explained, CMS "skip[s] an important logical step" by assuming that the Court can "precisely predict how the 2026 Star Rating would be calculated if [Alignment] succeed[s] on [its] claim." *Id.*

So, CMS's speculation about what may occur on remand provides no basis to dismiss Alignment's claim concerning contract H4961 for lack of standing. As explained, Alignment's declaration showed that inclusion of these 10 unlawful measures results in approximately $50 million in losses of rebates by decreasing the Star Ratings to 4.0 Stars and severely injures Alignment's reputation in the marketplace. Maroney Decl. ¶ 63. CMS does not dispute that these losses constitute concrete injuries. *See*, *e.g.*, *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017) (recognizing that even "[a] dollar of economic harm is still an injury-in-fact"); *Saline Parents v. Garland*, 630 F. Supp. 3d 201, 207-08 (D.D.C. 2022) ("Reputational injury can be a cognizable type of injury in fact.").

Instead, CMS speculates (at 10-13) that, under its calculations, removing the 10 challenged measures from contract number H4961 would leave that contract's Star Rating at 4.0 Stars. But that argument conflates injury with redressability. Whether Alignment suffered an injury turns on whether it "has been or will in fact be perceptibly harmed by the challenged agency action," *Nat'l Wildlife Fed'n v. Hodel*, 839 F.2d 694, 704 (D.C. Cir. 1988), *not* on CMS's prediction of what rating H4961 would receive following remand. The *existing* concrete harms from the *currently* incorrectly determined Star Ratings readily satisfy the injury-in-fact requirement and are not erased by CMS's prediction that H4961 might nevertheless receive 4.0 Stars after remand. *See Carpenters Indus. Council*, 854 F.3d at 5; *Saline Parents*, 630 F. Supp. 3d at 207-08. That prediction goes to whether Alignment's injuries are likely to be *redressed*, not whether they exist. And, as explained, to show redressability, Alignment need not demonstrate certainty of, or preemptively rebut, CMS's hypothetical decision on remand. *See Competitive Enter. Inst.*, 901 F.2d at 118 (recognizing the "uncertainty" inherent in predicting how a claim will be resolved on remand and explaining that redressability does not require "certainty"); *Fed. Election Comm'n*, 524 U.S. at 25 (redressability is satisfied even though agency may "reach the same result" on remand).

And even if the Court were inclined to consider the particulars of how a remand might proceed, Alignment still possesses standing. The parties' competing calculations of 4.5 Stars versus 4 Stars turn on methodological choices concerning how the ranking or "curve" would be re-calculated as between Alignment and *other plans* on remand, *i.e.*, the reward factor and CAI cut points (thresholds and category boundaries defining high- and low-performing plans) that would result after the challenged measures are removed. *See* Elevance Goldstein Decl. ¶¶ 6-9, 22. But *how* CMS must calculate the ranking/curve among plans on remand—and, consequently, *what*

H4961's precise Star Rating would be—requires the Court to first determine that CMS may lawfully recalculate those cut points and build a new, hypothetical "curve" on remand. *Elevance Health, Inc.*, 2026 WL 2531796, at *7. This is not a question properly before this Court and resolving it now would require the Court to render an "impermissible advisory opinion" on these choices. *Id.* at 8; *see also TransUnion LLC v. Ramirez*, 594 U.S. 413, 423-24 (2021) ("Federal courts do not possess a roving commission to publicly opine on every legal question.").

Despite CMS's casual assumption, its proposed recalculation methodology is unlawful. The two key Star Ratings cases in which judges of this Court overturned CMS's Star Ratings' methodology concerned CMS's choice to rely on "hypothetical" cut points to determine Star Ratings, rather than the *actual* cut points applicable to the measure year at issue. *See SCAN Health Plan v. HHS*, No. 1:23-cv-3910-CJN, 2024 WL 2815789, at *1 (D.D.C. June 3, 2024) (Nichols, J.); *Elevance Health, Inc. v. Becerra*, 736 F. Supp. 3d 1, 19 (D.D.C. 2024) (Moss, J.). Yet CMS proposes a similar approach here: using hypothetical CAI and reward factor cut points specific to Alignment, SCAN, and Elevance, which have never been applied to *any* plan at any point, while leaving all other plans subject to the *actual* cut points applied when CMS issued the 2026 Star Ratings in October 2025. That is not authorized by CMS's regulations, which provide for *one, actual* CAI and reward factor scale for *all plans*, namely, the one that CMS already developed and applied to all plans back in October 2025. 42 C.F.R. § 422.166(f) (providing for one CAI scale for all plans); *see also id.* § 423.186(f) (same for Medicare Part D); *see also id.* § 422.166(f)(1)(i) (contemplating one actual set of reward factor cut points); *id.* § 423.186(f)(1)(i) (same for Medicare Part D). Alignment's point is not that the Court must pre-judge CMS's methodological choices at this time; the point is simply that Alignment will vigorously contest CMS's attempt to place Alignment (and SCAN and Elevance) on a different CAI and reward factor scale than all

other plans, contrary to CMS's own regulations, and the time to judge those issues is *after* the remand.

There is a final flaw in CMS's argument. Even putting aside the differing calculation of the *overall* 2026 Star Ratings, no one disputes that removing the challenged measures would remediate at least a *portion* of Alignment's injury: The publication of 10 erroneous Star Ratings for *each individual measure* at 4 Stars or less on CMS's online Plan Finder, the principal tool seniors use to shop for Medicare Advantage plans. Maroney Decl. ¶¶ 52, 63; Amended Compl. ¶¶ 157-58, Dkt. No. 13. Said differently, even if CMS's argument were correct on the impact on the *overall* Star Rating, removal of these measures would remediate the publication of erroneous and derogatory *measure-specific Star Ratings* for each of these 10 measures on CMS's online Plan Finder tool that beneficiaries use to shop for plans. *Id.* That, too, supports standing. *See Foretich v. United States*, 351 F.3d 1198, 1210 (D.C. Cir. 2003) (recognizing that reputational injuries are "amenable to redress" so as to "satisfy the requirements of Article III standing"); *McBryde v. Comm. to Rev. Cir. Council Conduct & Disability Ords. of Jud. Conf. of U.S.*, 264 F.3d 52, 57 (D.C. Cir. 2001) (similar).

For all of these reasons, Alignment has standing to maintain its challenge to the determination of its 2026 Star Rating for contract number H4961.

## II. CMS DETERMINED ALIGNMENT'S 2026 STAR RATINGS IN VIOLATION OF 42 U.S.C. § 1395HH(A)(2)

CMS applied 10 measures[3] to lower Alignment's Star Ratings from 4.5 to 4 Stars for contracts numbers H3815, H4961, and H3443 without adopting those measures' specifications as

[3] Namely, Annual Flu Vaccine (C03), Improving or Maintaining Physical Health (C04), Improving or Maintaining Mental Health (C05), Reducing the Risk of Falling (C15), Improving Bladder Control (C16), Getting Needed Care (C22), Getting Appointments and Care Quickly (C23), Customer Service (C24), Rating of Health Care Quality (C25), and Care Coordination (C27).

regulations required by § 1395hh(a)(2). CMS does not dispute that a recalculation without those measures provides 4.5 Stars for H3815 and H3443; as to H4961, CMS disputes only the rating that would result on remand. Accordingly, the Court should vacate Alignment's 2026 Star Ratings for these three contracts and require CMS to recalculate its Star Ratings without inclusion of the 10 challenged measures.

If any aspect of Medicare requires promulgation "by regulation," it is the Star Ratings measures. Section 1395hh(a)(2) provides that "[n]o rule, requirement, or other statement of policy . . . that establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of . . . entities[] or organizations to furnish . . . services or benefits under this subchapter shall take effect unless it is promulgated . . . by regulation." 42 U.S.C. § 1395hh(a)(2). Recognizing that Medicare "touches the lives of nearly all Americans" and that "even minor changes to the agency's approach can impact millions of people and billions of dollars in ways that are not always easy for regulators to anticipate," Congress imposed a broad notice-and-comment regime for Medicare rules, requirements, and statements of policy, to ensure public input, transparent decisionmaking, and clearly defined standards for Medicare. *Allina*, 587 U.S. at 568, 582.

Congress provided for codification by regulation for exactly this circumstance. Most Medicare beneficiaries now elect Medicare Advantage, and the Star Rating is one of the most important determinants—if not the most important—of how plans are paid, what benefits they offer, and whether program participation is terminated. The measures determine those outcomes, and in turn, dictate how plans must reshape American healthcare.

Unsurprisingly, CMS does not contest much of Alignment's argument, namely, that the measures and their specifications amount to a "rule, requirement, or other statement of policy" that

establish "substantive legal standard[s]." 42 U.S.C. § 1395hh(a)(2); Alignment Br. 20-23. CMS has therefore conceded those elements for purposes of this case. *Fox v. Gov't of D.C.*, 794 F.3d 25, 29 (D.C. Cir. 2015) (inadequately developed argument is forfeited). Nevertheless, the point is correct on the merits and does not depend on CMS's silence. The measure specifications are the fixed criteria by which CMS determines each plan's Star Rating, they are stated in generally applicable terms and applied uniformly to every contract, and CMS treats them as binding on plans and on itself. They are therefore "rule[s], requirement[s], or other statement[s] of policy . . . that establish[] . . . substantive legal standard[s]" within the meaning of § 1395hh(a)(2), as the Southern District of Georgia held with respect to these same measures. *Clover Ins. Co.*, 2026 WL 1483515, at *22.

Instead, recycling arguments from its unsuccessful *Clover* briefing, CMS argues (at 13-23) that the measures supposedly do not "govern[] the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish . . . services or benefits under this subchapter." 42 U.S.C. § 1395hh(a)(2). As the Southern District of Georgia correctly recognized, CMS's arguments are incorrect. *Clover Ins. Co.*, 2026 WL 1483515, at *22-25. Indeed, few standards could more directly govern payments for services, eligibility, and benefits than the Star Ratings measure specifications.

### A. The Measures Govern Payment For Services

#### 1. Congress made clear that "payment for services" includes payments from CMS to plans for all services covered under the plans

The challenged Star Ratings measure specifications "govern[] . . . payment for services." 42 U.S.C. § 1395hh(a)(2). In Medicare Advantage, the relevant "payment for services" refers to the payments that CMS by statute must make *to the plan* for furnishing covered services under the plan, and Star Ratings directly determine the amount of that payment. *See HMO La., Inc. v. HHS*,

793 F. Supp. 3d 150, 153 (D.D.C. 2025) (Cooper, J.) (CMS "uses the star ratings to determine the bonuses paid to MA Plans."); *SCAN Health Plan*, 2024 WL 2815789, at *1 (CMS must "offer additional funding to plans with better Star Ratings."). As this Court put it succinctly: "MA Plans receive annual star ratings from CMS evaluating the *quality of their services*." *HMO La.*, 793 F. Supp. 3d at 153 (Cooper, J.).

As Alignment explained in its opening brief, *see* Alignment Br. 9-10, the statute incorporates Star Ratings into two formulas that determine payments to plans to the tune of hundreds of millions of dollars (and billions of dollars across the program). The first formula, codified at 42 U.S.C. § 1395w-23(o) and known as the quality bonus payment, rewards Medicare Advantage plans rated 4 Stars or higher with an increased 5 percent benchmark against which to bid. That effectively either increases the total amount of money the plan is eligible to receive, including in the form of a rebate (if its bid is below the benchmark), or reduces the premium the plan must charge its members (if its bid is above the benchmark). And the second formula, codified at 42 U.S.C. § 1395w-24(b)(1)(C), gives higher-rated plans a larger portion of the difference between their bid and their benchmark back as a rebate. There is therefore a direct line from the Star Ratings measure specifications to the amount CMS pays Medicare Advantage plans: The specifications determine a plan's Star Rating, and the Star Rating determines the benchmark and rebate percentages used to determine the plan's payment.

CMS's contrary arguments fail. CMS attempts (at 14-16) to import the payment structure of *traditional Medicare* into Medicare Advantage by restricting "payment for services" to direct payments from CMS to healthcare providers, as occurs under traditional Medicare. But Congress structured Medicare Advantage differently.

Unlike traditional Medicare, in which *providers* provide services and *CMS pays* providers for *each* service (also known as "fee-for-service," such as "$50 per well-child visit"), under Medicare Advantage, *plans* provide services, in exchange for *fixed* monthly payments from CMS, and *plans* generally decide provider reimbursements. Medicare Advantage plans, including coordinated care plans such as Alignment, must *themselves* "provide health care services" via their networks. 42 U.S.C. § 1395w-21(a)(2)(A)(i) ("Coordinated care plans . . . provide health care services."). All "services" are "provide[d]" by the plan. *Id.* Indeed, the plan's annual bid is for the amount of payment it requires for "provision of all items and *services under the plan.*" *Id.* § 1395w-24(a)(6)(A)(i). Synthesizing this together, the "bid" a plan makes for the payment it requires, and the payments it ultimately receives, are not in exchange for an abstract term such as "coverage" or "benefits" as CMS suggests in its brief (based on nothing in the statute's text); instead, it is for "provision of all . . . services under the plan," and it is "plans" that "provide health care services." *Id.* § 1395w-21(a)(2)(A)(i).

Thus, subject to limited exceptions not applicable here, *only* the plan, *not* providers, may "receive payments from the Secretary under this subchapter for services furnished." *Id.* § 1395w-21(i)(2). As this provision makes clear, there is an exchange: plans "receive payments from the Secretary" in exchange for "services furnished" from plans to beneficiaries. *Id.* And this design, which views *plans* as the ones furnishing services, makes sense in the broader statutory framework: Under Medicare Advantage, unlike traditional Medicare, the government fully shifts the risk of healthcare costs to the plans. If healthcare costs *more* than plans expected to bid, plans *lose money* and have no recourse to the government; the whole point of the system is that the plans commit to provide *all* covered services through a *fixed* bid. 42 U.S.C. § 1395w-25(b) (providing that plans "shall assume full financial risk on a prospective basis for the provision of the health care

services"); *id.* § 1395w-24(a)(6)(A)(i) (mandating that a plan's bid account for "the provision of all items and services under the plan"). The government does not dictate the payments that plans must make to providers; plans choose their own provider networks and settle upon their own bespoke payments to providers. *Id.* § 1395w-22(d)(1) (providing that a plan "may select the providers from whom the benefits under the plan are provided"). Given this text, structure, and purpose, "payment for services" clearly includes payments *to plans*, which the statute views as the entities providing the services. *See Clover Ins. Co.*, 2026 WL 1483515, at *24 (rejecting CMS's argument because "the Medicare Act provides for payments for services flowing between multiple parties in multiple different directions, including payments by CMS to plans").

And what are those "services" that plans provide in exchange for the payments that CMS makes? Under Medicare Advantage, they are core Medicare Part A and B covered services (hospital and physician/outpatient), 42 U.S.C. § 1395w-21(a)(1)(A), *and* services forming part of supplemental benefits, *id.* § 1395w-22(a)(3). To provide *all* of these services (Part A, Part B, and supplemental), a plan must submit a "monthly aggregate bid amount for the *provision of all items and **services** under the plan*." *Id.* § 1395w-24(a)(6)(A)(i). Those "items and services under the plan" are then immediately divided in the next provision into sub-components: core "benefits under . . . original Medicare," "supplemental health care benefits," and "basic prescription drug coverage." *Id.* § 1395w-24(a)(6)(A)(ii). *All of those services are* paid in a single payment *to the plan*: original Medicare, supplemental benefits, and, where applicable, Part D prescription drug coverage. *Id.*; *id.* § 1395w-23(a)(1). And all are defined as types of "items and services." *Id.* In other words, the point is not that "services" and "benefits" are identical and coextensive in every single case; it is that Congress defined benefits as those services *that are covered* by the Medicare Advantage plan. *Id.* "Items and services *under the plan*" are defined as coextensive with the

"benefits" for which the plan *provides coverage*. *Id.*

So CMS is wrong (at 14-16) to try to limit "payment for services" to payments *to providers* under *Parts A and B*, traditional Medicare, and not to have any bearing on Medicare Advantage in Part C, which involves payments *to plans* in exchange for both services covered by original Medicare (Parts A and B, covered via Part C) and services forming part of Medicare Advantage supplemental benefits. Rather, those "services" *expressly* include *both* core services (Parts A and B) *and* supplemental (Part C) benefits. *Id.* § 1395w-24(a)(6)(A)(ii); *id.* § 1395w-23(a)(1); *see also* 42 C.F.R. § 400.202 ("services means medical care or services and items, such as medical diagnosis and treatment"). CMS's own regulations make explicit that Part C supplemental benefits *are "services*," time after time after time. 42 C.F.R. § 422.100(c)(2)(i)(A)-(B) ("Supplemental benefits consist of . . . services not covered by Medicare"); *id.* § 422.2 ("supplemental benefits" are "services not covered by Medicare"); *id.* §§ 422.504(a)(16), (d)(1)-(2), (e)(1)-(2), (f)(2) (treating *all* benefits as "services"); 91 Fed. Reg. 17,384, 17,485 (Apr. 6, 2026) ("supplemental benefits" are "services"); 88 Fed. Reg. 22,120, 22,186 (Apr. 12, 2023) (similar); *Glob. Rescue Jets, LLC v. Kaiser Found. Health Plan, Inc.*, 30 F.4th 905, 909 (9th Cir. 2022) (noting that Medicare Advantage plans offer "'supplemental benefits' for services not covered by original Medicare"). CMS's atextual distinction (at 15-16) between "services" and "benefits" is simply wrong and violates the statute *and* CMS's regulations.

All of this is why case after case, and regulation after regulation, makes clear that "services" are provided *by the plan* in exchange for CMS's payment, and the Star Ratings bonus payments thus govern the "payment for services." As the D.C. Circuit explained: "the quality of the consumed contract's SNP [special needs plan] *services* is relevant to the consolidated contract's star-rating calculation." *HMO La., Inc. v. HHS*, 179 F.4th 62, 71 (D.C. Cir. 2026).

Thus, "MA Plans receive annual star ratings from CMS evaluating the *quality of their services*." *HMO La.*, 793 F. Supp. 3d at 153 (emphasis added) (Cooper, J.). Indeed, the "overall rating" for the Star Ratings "means a global rating that summarizes the quality and performance for the *types of **services offered*** across all unique Part C and Part D measures." 42 C.F.R. § 422.162; *see also Elevance Health, Inc.*, 736 F. Supp. 3d at 4 ("CMS rates certain Medicare insurance plans on a one-to five-star scale to reflect the quality of care *and services the plans offer*." (emphasis added)). As this regulation makes clear, the services are "offered" by the plan. *Id.*

With the understanding that "payment for services" includes payments to plans for *all* of their services, it is clear the Star Ratings measures "govern" "payment for services." *See Clover Ins. Co.*, 2026 WL 1483515, at *23-24. The Star Ratings directly determine the amounts of payments to plans for *all* of their services by raising the benchmark and increasing rebates. *HMO La.*, 793 F. Supp. 3d at 153; *SCAN Health Plan*, 2024 WL 2815789, at *1; *supra* at 3, 15.

Nevertheless, CMS argues (at 16-17) that *all* plans are entitled to monthly payments for each beneficiary and *must* pay for covered treatment, regardless of Star Ratings or any quality bonus payment. That is true, but the *amount* of the payment from CMS *to the plan* for *its* services is determined by its Star Rating. 42 U.S.C. § 1395w-23(o); *id.* § 1395w-24(b)(1)(C)(v). That all plans must provide the same core benefits to all beneficiaries does not mean *CMS pays all plans the same amount for providing those services*: Indeed, the core point of tying payments to Star Ratings was to incentivize plans to offer higher *quality* core traditional Medicare (Parts A and B) services to *increase payments for the same basket of core services*. *Supra* at 17-18.

CMS next argues (at 17) that plans are *forbidden* from using quality bonus payments to pay for Part A and B "services," only for supplemental benefits and premium reductions. But *all* of those categories of benefits, core Part A and B *and supplemental benefits*, are "services." *Supra*

at 17-18. So even under CMS's own theory, Star Ratings dictate higher payments for services.

And although it does not matter, CMS's claim that plans do not use bonus payments to pay for core Part A/B benefits is wrong too. The core insight CMS's argument misses is straightforward. Consider a bidder competing for a government contract to build a road. If the government raises the maximum amount it is willing to pay from $90 million to $100 million, the bidder gains the option to submit a higher bid. The same is true here: a higher benchmark, due to Star Ratings quality bonus payments, gives Medicare Advantage Organizations more "headroom" to bid for core Medicare Part A/B benefits. *Supra* at 15-16.[4] Indeed, CMS elsewhere *accepts* (at 10) that a plan can "increase its bid" for Part A/B benefits using bonus payments generated by the Star Rating program by raising the benchmark for its bid.[5]

---

[4] Here is how the statute implements that intuition: A plan provides a bid for the amount it requires, per beneficiary, to provide all benefits. 42 U.S.C. §§ 1395w-23(a)(1)(B), 1395w-24(a). CMS sets a benchmark based on how much Part A and B benefits *should* cost in a given geographical area for *any plan*. *Id.* § 1395w-23(j). A plan with a Star Rating bonus payment earns a *higher benchmark* and *necessarily* obtains more revenue. *Id.* § 1395w-23(o). If a plan's bid is at or *above* the benchmark, the plan receives a monthly payment that is equal to the benchmark to cover traditional Medicare services (Parts A and B). *Id.* § 1395w-23(a)(1)(B)(ii). If a plan's bid is *below* the benchmark, the plan receives a payment that is equivalent to its bid *plus a rebate*. *Id.* §§ 1395w-23(a)(1)(B)(i), (a)(1)(E). The point is that a bonus payment *increases the monthly payment*, *regardless* of whether the plan bids above or below the benchmark, and *regardless* of whether a rebate is generated, *by raising the benchmark*. *Id.* § 1395w-23(o). That is, the bonus payment increases the "headroom" for the bid, *and the plan can use that "headroom" to raise its bid (for Part A/B benefits)*, and/or receive higher rebates (which fund supplemental benefits). *Id.*

[5] CMS also argues (at 19) that the medical loss ratio ("MLR") does not dictate that plans must allocate Star Ratings funds to pay providers higher rates. CMS misses the point: As explained above, the relevant locus of analysis is payments *to plans*, not payments *to providers*. Moreover, even if payments to providers were relevant to this analysis, plans allocate bonus payments to provide *medical* benefits, including supplemental benefits, *which are a subset of services*. That is, the MLR links revenues to expenditures on "services," and Star Ratings payments increase those revenues. And, if a plan fails to meet the MLR for 3 consecutive years, CMS *must* suspend enrollment, and if it fails for 5 years, the statute *mandates* contract termination. 42 U.S.C. § 1395w-27(e)(4)(A)(ii)-(iii), (C). Although CMS argues (at 19) that Alignment failed to provide *evidence* that plans increase payments to providers as they approach the MLR threshold, Alignment need not prove the obvious inference built into the statutory scheme: Faced with the choice between using additional revenues to provide medical services and repeatedly falling below

CMS's reliance on the pending-on-appeal decision in *Humana Inc. v. U.S. Dep't of Health & Hum. Servs.*, 806 F. Supp. 3d 642 (N.D. Tex. 2025) (at 15) does not change this conclusion. Humana's briefs failed to raise the arguments above, and with limited briefing, the court had no occasion to address the statutory arguments set out above, and it therefore reached the wrong result. The court surmised that "payments for services" must refer to amounts "*Medicare must pay providers* for furnishing covered services." *Id.* at 648 (emphasis added). Although the court did not explicate its reasoning, it does not follow from the *Medicare Advantage* statute, under which CMS generally *cannot* pay providers for services. 42 U.S.C. § 1395w-21(i)(2). The notion that payments must be for Part A or B "covered services," too, is erroneous; as explained, Medicare Advantage "services" encompass both core "covered services" *and* supplemental benefits.

For its definition of "services," the *Humana* court relied on "1395w-22(a)(B)(iv)" (presumably intending to refer to § 1395w-22(a)(1)(B)(iv)). 806 F. Supp. 3d at 648. But that provision does not define "services": Rather, § 1395w-22(a)(1)(A) requires plans to provide Part A and B services, and § 1395w-22(a)(1)(B)(iii)-(iv) defines *which subset* of those services must have *cost-sharing limited* for Medicare beneficiaries. Indeed, the court's cited list of "services" in (B)(iv) *excludes most* core Medicare services, including hospital, ER, and physician services. 42 U.S.C. § 1395w-22(a)(1)(B)(iv). Section 1395x similarly defines dozens of *sub-types* of "services," such as "nursing services" and "surgical services," but *never* defines "services" itself.[6]

Nor does *Allina* support CMS's position. CMS quotes *Allina*'s observation (at 15) that, under Medicare ***Part A***, "the federal government has paid hospitals directly for providing covered

---

the MLR—with enrollment suspension and ultimately mandatory contract termination as the consequences—plans have every incentive to choose the former.

[6] On this point, CMS also proffers (at 15) §§ 1395d, 1395k, which *Humana* did not rely upon, but those citations are even further afield: They are *Part A and B* provisions that define the right to have payment made for specified *sub-types* of services under *Parts A and B*, unrelated to Part C.

patient care." 587 U.S. at 570. In other words, it discussed traditional fee-for-service Medicare. *Allina* did not decide whether Medicare Advantage's distinct payment structure, under which CMS pays plans to provide beneficiaries' healthcare services, constituted "payments for services." *Id.* Medicare Advantage was not before the Court, and the Court did not opine on its distinct structure.

For all of these reasons, the Star Ratings measures govern payments for services.

**2. CMS is wrong in arguing that there is a "conflict" between Alignment's interpretation of "payment for services" and § 1395w-23(b)**

CMS asserts (at 21-22) that, if measure specifications were to "govern[] . . . the payment for services" under § 1395hh(a)(2), it would create a conflict with § 1395w-23(b). Section 1395w-23(b) provides that CMS "shall determine, and shall *announce* . . . [t]he annual MA [Medicare Advantage] *capitation rate* for each MA *payment area* for the year." *Id.* § 1395w-23(b)(1)(B)(i). CMS makes this announcement through its annual call process on its website but does not engage in rulemaking. *Id.* § 1395w-23(b)(2). CMS claims that Alignment's reading of § 1395hh(a)(2) imposes a more burdensome rulemaking procedure than the annual-call process § 1395w-23(b)(1)-(2), and if both provisions were read to cover the same subject (capitation rates), it would nullify the "annual call" process in § 1395w-23(b)(1)-(2).

CMS's argument is essentially a variation on a "specific controls over the general" and "surplusage" canons: CMS argues that the more specific § 1395w-23(b) "annual call" provision purportedly conflicts with, and thus overrides, the more general notice-and-comment provision in § 1395hh(a)(2). Otherwise, CMS says, it would make surplusage of the "annual call" process. But there is no conflict: The provisions reconcile together as a harmonious whole without conflicting. *See Air Transp. Ass'n of Am., Inc. v. U.S. Dep't of Agric.*, 37 F.4th 667, 672 (D.C. Cir. 2022) ("[I]f possible, we are to construe a statute so as to give effect to every clause and word."); *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 724 (D.C. Cir. 2022) (rejecting

specific-over-general and surplusage arguments where the provisions did not "irreconcilably conflict" and "each provision does meaningful, independent work, despite the possibility for partial overlap"); *Adirondack Med. Ctr. v. Sebelius*, 740 F.3d 692, 698-99 (D.C. Cir. 2014) (holding that the specific-over-general canon did not apply because the provisions "complement and overlap" with one another and thus could be harmonized and given concurrent effect).

At bottom, CMS misreads the statute, and it is not a close call. CMS is reading (at 21-22) the announcement of "[t]he *annual MA capitation rate* for each MA payment area for the year" as meaning "*the amount the government pays* each Medicare Advantage plan for each enrollee." So, CMS argues, it follows that when CMS determines how much it will pay Medicare Advantage plans, CMS may use the annual-call process on its website and need not proceed by regulation under § 1395hh(a)(2). That is flatly incorrect. In the simplest terms possible, (1) the "annual MA capitation rate" announced through the annual call process under § 1395w-23(b)(1)(B)(i) is a sub-component-of-a-sub-component that informs the *uniform benchmark* in a region that *all* plans bid against (a single number), while (2) the "amount the government pays" is the *final output* of that bidding process, and is *specific to each plan*, *see* 42 U.S.C. § 1395w-23(a)(1)(B). The "capitation rate" is a sub-component-of-a-sub-component that feeds into the bidding process; it is something like 10+ steps removed from the ultimate "*amount the government pays* each Medicare Advantage plan." In other words, CMS uses the annual call process to announce one small sub-component of the bidding process; the annual call process does not encompass everything that influences the "amount the government pays each Medicare Advantage plan," as CMS claims.

A deeper dive into the statutory mechanics shows the "annual MA capitation rate" has just that limited role; it does not resemble the "amount the government pays each [plan]" as CMS contends. The "annual MA capitation rate" or equivalently "annual Medicare+Choice capitation

rate" is calculated under § 1395w-23(c)(1) as "the largest of the amounts specified in . . . subparagraph (A), (B), (C), or (D)," and is not itself the amount paid to any plan. Rather, it is an input into the "MA area-specific non-drug monthly *benchmark* amount," defined under § 1395w-23(j) as "1/12 of the blended benchmark amount determined under subsection (n)(1) for the area for the year." That blended benchmark in (n)(1), in turn, is the uniform, county-level bidding target against which every plan submits its bid. *Id.* § 1395w-23(n). Specifically, (n)(4) requires that no county's blended benchmark may exceed the county's "applicable amount" under subsection (k)(1), which itself is derived from the (c)(1) capitation rate. *Id.* §§ 1395w-23(k)(1)(A)(i), (B). In sum, the "capitation rate" is a sub-component that feeds into the *benchmark* against which plans must bid. *By contrast*, the amount the government actually pays a plan is determined under § 1395w-23(a)(1)(B): If a plan's bid falls below the benchmark (technically, the "MA area-specific non-drug monthly benchmark amount"), its payment equals the bid plus a rebate; if a plan's bid is at or above the benchmark, its payment equals the benchmark, and the enrollee pays the excess as a premium. (*Prior to 2006*, the "capitation rate" served a different and more important function and *was* the entire payment to the plan; that helps explain the historical provenance of Congress imposing a specialized process for that provision at that time.)

In short, CMS's argument is like arguing, "because we make a hamburger using pickles, it follows that the pickles and the hamburger are actually same thing." The capitation rate is a small component that *feeds into* the amount plans are paid (albeit, many steps removed from that payment); CMS is simply wrong that the "capitation rate" is the same as the amount paid to a plan.

With that clarification in mind, there is no conflict. Section 1395w-23(b) requires CMS to announce the annual Medicare Advantage capitation rate *for each payment area*, which is a numerical value (a dollar amount), not a generalized rule, requirement, or policy that establishes a

legal standard under § 1395hh(a)(2). 42 U.S.C. § 1395w-23(b)(1)(B)(i); *see id.* § 1395w-23(a)(1)(A)(i), (c)(1)(B). The capitation rate is merely one, today relatively limited, geographically specific sub-component that feeds into the benchmark *against which* plans bid. *Id.* The challenged Star Ratings measure specifications, by contrast, are the rules, requirements, and policies that establish substantive standards for whether plans receive payment increases for their services. Because those are fundamentally different things, CMS's claimed conflict is illusory.

And CMS's argument proves far too much. If CMS were correct that the surplusage canon means that nothing relating to plan payments can ever trigger § 1395hh(a)(2)—because Congress provided a separate mechanism for announcing the capitation rate—then § 1395hh(a)(2) would be drained of its force in the Medicare Advantage context, because this "conflict" would eviscerate § 1395hh(a)(2)'s "payment" prong altogether for Medicare Advantage. But nothing in either provision supports the view that Congress meant to override § 1395hh(a)(2) *sub silentio* and in such a circuitous manner. To the contrary, § 1395hh(a)(2) applies to substantive legal standards governing "the payment for services," without excluding Medicare Advantage. CMS cannot transform a provision governing announcement of the capitation rate into an exemption Congress never enacted for any and all standards governing payments for those services.

In short, even taking CMS's arguments on their own terms, and assuming that there were a conflict, which there is not, the *most* CMS's argument might prove is that the more-specific "capitation rate" provision allows CMS to announce the "capitation rate" via the "annual call," while leaving the rest of § 1395hh(a)(2) intact and applicable to "payment for services" for all other purposes. CMS cannot use the more-specific provision in § 1395w-23(b)(1)-(2) to *override and swallow* the *more general* rule in § 1395hh(a)(2) in *all of its applications*. *See Changji Esquel Textile Co.*, 40 F.4th at 724 (declining to give a specific provision controlling effect over a more

general provision absent an "irreconcilabl[e] conflict[]" between the two); *Adirondack Med. Ctr.*, 740 F.3d at 698-99 (similar). Under black-letter law, CMS cannot leverage a limited, more-specific exception to swallow the more-general rule that Congress defined. *Id.*

**B. The Measures Govern Eligibility To Furnish Services And Benefits**

The Star Ratings measure specifications also "govern[] . . . the eligibility of . . . entities, or organizations to furnish . . . services or benefits." 42 U.S.C. § 1395hh(a)(2). CMS may terminate plans from the Medicare Advantage program if they fail to achieve a Star Rating of at least 3 Stars over 3 years, 42 C.F.R. § 422.510(a)(4)(xi), or they receive a Part C or Part D Star Rating of 2.5 or less for 2 years, *id.* § 422.502(b)(1)(i)(D). For a plan, that is the corporate death penalty.

CMS offers one response (at 20): that termination is discretionary, not mandatory, if the termination criteria are met, and thus the Star Ratings do not "govern" eligibility. CMS is misreading the word "govern." And the practical consequence of CMS's reading (at 20) is that, because all (or essentially all) of CMS's regulations allowing program termination *under Parts A, B, C, or D* are discretionary, *no rules, requirements, or policies* elaborating, interpreting, or defining these enumerated bases for termination actually "govern" eligibility. 42 C.F.R. §§ 422.510(a), 423.509(a), 489.53(a), 424.535. That is obviously not what Congress had in mind; indeed, that interpretation renders the "eligibility" provision of § 1395hh(a)(2) without effect, exempting from rulemaking the entire body of standards by which CMS decides whether plans and providers may continue in the program.

Contrary to CMS's contentions, the term "govern" does not connote a non-discretionary duty to terminate a given entity's program participation. Here, "governing" clearly refers to a legal standard that "control[s] legal procedure for (an action, practice, process, etc.)," for example, in the phrase "laws that govern the sale of alcohol." *Govern*, Webster's Dictionary Online; *see also*

*Govern*, Webster's New World College Dictionary (4th ed. 1999) ("to be a rule or law for"); *id.* ("influence" or "guide"); Webster's New World Dictionary (2d College ed. 1984) ("to be a rule or law for"); *id.* ("influence" or "guide"); *Govern*, Black's L. Dictionary (6th ed. 1990) ("To be a rule, precedent, law or deciding principle for."); *Abbott v. Biden*, 70 F.4th 817, 830-31 & n.9 (5th Cir. 2023) ("govern" as to "regulate," "influence," "manage," or "regulate by authority"). For example, Rule 11 governs sanctions, but it does not mandate them. Or, factors such as premeditation and cruelty all govern imposition of the death penalty, even if a jury retains ultimate discretion.

The D.C. Circuit has likewise explained that a legal standard may "govern" a subject while leaving the agency substantial discretion. Statements of policy are those that "advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 537 (D.C. Cir. 1986); *see also Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1046 (D.C. Cir. 1987) (noting that a hallmark of a policy statement is that it "genuinely leaves the agency and its decisionmakers free to exercise discretion"). That an agency retains discretion under a policy, however, does not mean that the policy cannot "govern" how the agency exercises that discretion. In *Syncor International Corp. v. Shalala*, 127 F.3d 90 (D.C. Cir. 1997), for example, the court explained that a policy statement describes how an agency will treat a "governing legal norm," while emphasizing that an agency "retains the discretion and the authority to change its position—even abruptly—in any specific case." *Id.* at 94. In other words, the D.C. Circuit has recognized that a standard may "govern[]" agency action by supplying a framework for the agency's exercise of "discretion," even where it does not dictate a particular outcome. *See id.*; *see also Clarian Health W., LLC v. Hargan*, 878 F.3d 346, 355 (D.C. Cir. 2017) (describing provisions that "authorize[] the Secretary to determine" payment

amounts as among the "substantive legal standards governing provider reimbursement"). CMS is therefore wrong that discretion over whether to terminate a plan means the Star Ratings thresholds do not "govern" eligibility; the thresholds supply the standard, and any discretion operates within it.

And the statute's broader text and structure reinforce this plain text meaning of "govern." Section 1395hh(a)(2) requires rulemaking for, *inter alia*, a "statement of policy," which, again, provides how CMS intends to *exercise its discretion*. *Allina*, 587 U.S. at 572, 575 (a "statement of policy" describes CMS's current "adjudicatory approach," and is not "binding"); *Pac. Gas & Elec. Co. v. Fed. Power Comm'n*, 506 F.2d 33, 38 & n.17 (D.C. Cir. 1974) (similar). Because a "statement of policy" is *inherently* discretionary, it makes no sense to construe a "statement of policy" establishing a standard "governing . . . eligibility" as one imposing a *mandatory* duty.

Indeed, CMS's interpretation is more problematic than just that: It would read the "statement of policy" trigger for rulemaking out of § 1395hh(a)(2) altogether, because the term "governing" must *always* be met for *any* of the statutory criteria for rulemaking (payments, eligibility, benefits) to be triggered. CMS cannot make surplusage of the phrase "statement of policy" in this manner. *Duncan v. Walker*, 533 U.S. 167, 174 (2001) ("It is our duty to give effect, if possible, to every clause and word of a statute."); *Allina*, 587 U.S. at 572-75 (rejecting CMS's interpretation of "substantive" as such a reading would render § 1395hh(a)(2)'s inclusion of "statements of policy . . . incoherent").

CMS's citation (at 20) to *Humana* is thus unpersuasive. That court adopted a distinct definition of "govern" as connoting a degree of *power*, *i.e.*, "decisive influence." 806 F. Supp. 3d at 648. But the court did not discuss the surrounding text, all of which points to "governing" as providing *standards for a given subject*, not a degree of *power*. *Supra* at 26-27. Indeed, the court

selected a definition of "governing" that, according to its own selected dictionary, *does not apply* to the verb form that Congress enacted here, as the Southern District of Georgia itself identified.[7] In all events, Star Ratings are a *sufficient* basis to terminate; that is "decisive." *See Bland v. New York*, 263 F. Supp. 2d 526, 551 (E.D.N.Y. 2003) (holding that an issue was "decisive" because its resolution, standing alone, was sufficient to defeat the plaintiff's claim).

**C. The Measures Govern The Scope Of Benefits**

The measures and their specifications also "govern[] the scope of benefits." 42 U.S.C. § 1395hh(a)(2). Plans with higher Star Ratings use the resultant funds to "provide [beneficiaries] with additional benefits" and lower premiums. *SCAN Health Plan*, 2024 WL 2815789, at *1. Star Ratings are determinative of payments to plans, and in turn the benefits included under Part C (supplemental benefits) that they offer. *Supra* at 15-16. Indeed, the *overriding* function of Star Ratings is to determine payments and benefits. *Id.*

CMS responds (at 21) that a plan "can offer whatever supplemental benefits it wants, regardless of its Star Rating." But the Medicare Act does not permit plans to offer unfunded benefits untethered from revenues (payments). By law, a plan's bid must be prepared on an

[7] The court's cited definition of "govern" applies only to the *intransitive* verb form. *Govern*, Webster's Dictionary Online, https://tinyurl.com/5xb5pwwp. An intransitive verb, *unlike* the verb "govern" here, lacks an object. *Maples v. State*, 968 N.W.2d 446, 451 (Mich. 2021). "'Govern' can take on multiple meanings depending on whether the verb is used transitively (with a direct object) or intransitively (without a direct object)." *Clover Ins. Co.*, 2026 WL 1483515, at *23. The *intransitive* "govern" connotes a degree of power, *i.e.*, "decisive influence," as in "allow reason to govern" or "a contract's text governs." *Govern*, Merriam Webster (2025). But as used here, the verb is *transitive*, with an object, *i.e.*, a standard "governing . . . *eligibility*." 42 U.S.C. § 1395hh(a)(2). The *transitive* form has a broader range of meanings, including "to control legal procedure for (an action, practice, process, etc.)," such as "laws that govern the *sale of alcohol*," the object. *Govern*, Merriam Webster (2025); *see also Clover Ins. Co.*, 2026 WL 1483515, at *23 (holding that "'govern' used this way, is defined as 'to constitute a rule or law for; serve as a precedent or deciding principle for'"). (And even when used *transitively* to connote power, the term connotes a "*guiding* influence." *Govern*, Merriam Webster (2025).)

actuarial basis reflecting the plan's "revenue requirements" to provide benefits, and CMS may accept a bid only if it "reasonably and equitably reflects the revenue requirements . . . of benefits provided under that plan." 42 U.S.C. §§ 1395w-24(a)(6)(A), (B)(ii); 42 C.F.R. § 422.254(b)(3). To meet CMS's actuarial standards, plans must link benefits with the revenues to offer them. *Id.* A standard that dictates whether plans have hundreds of millions of dollars in revenue dictates the scope of benefits. *Id.*

Finally, CMS's argument (at 21) that measures cannot govern the scope of benefits because "Alignment presents no evidence that the Secretary's approval of supplemental benefits must be 'by regulation' under Section 1395hh(a)(2)" attacks a position Alignment does not take. Alignment does not contend that CMS's annual approval of each particular plan's supplemental benefits package must itself be issued by regulation. That individualized approval merely applies CMS's standards to a particular plan and its particular benefits; it does not itself establish a generally applicable "rule, requirement, or other statement of policy" setting the standards by which CMS will determine what supplemental benefits may be offered *in general for all plans*. 42 U.S.C. § 1395hh(a)(2); *cf. Georgetown Univ. Hosp. v. Bowen*, 821 F.2d 750, 754 (D.C. Cir. 1987) (contrasting calculations done on a "provider-by-provider basis" from "issuing regulations of general applicability" estimating the reasonable cost of providers). CMS thus conflates the individualized decision applying a standard with the standard that governs that decision. That CMS need not promulgate each plan-specific approval by regulation does not mean that generally applicable standards defining what benefits CMS will approve fall outside § 1395hh(a)(2).

**D. CMS's Appeal To Policy Cannot Outweigh The Clear Text Of § 1395hh**

Unable to truly reconcile its position with the statutory text, CMS resorts to policy. CMS contends (at 22-23) that the Star Ratings system would become unworkable if the Court were to find that Star Ratings measures and their specifications were required to be promulgated through

notice-and-comment rulemaking under § 1395hh(a)(2). But the law on this point is clear: a court cannot "set aside a statute's plain language simply because the agency thinks it leads to undesirable consequences." *Friends of Earth, Inc. v. EPA*, 446 F.3d 140, 145 (D.C. Cir. 2006); *see also Eagle Pharms., Inc. v. Azar*, 952 F.3d 323, 337 (D.C. Cir. 2020) (agency cannot avoid the text of a statute by "asserting that its preferred approach would be better policy"). The clear text of § 1395hh leads to the conclusion that Star Ratings measures and specifications must be promulgated by regulation. *Supra* at 13-30. Although CMS may believe that the Star Ratings system as currently implemented without proceeding "by regulation" is good policy, "good policy does not change the statute's text." *Bais Yaakov of Spring Valley v. FCC*, 852 F.3d 1078, 1083 (D.C. Cir. 2017).

Indeed, in *Allina*, the Supreme Court rejected this very line of reasoning. 587 U.S. at 581-82. There, the government warned that subjecting interpretive rules to § 1395hh(a)(2)'s notice-and-comment requirement could take "many years" and produce serious administrative difficulties. *Id.* at 581. The Supreme Court's answer was straightforward: "courts aren't free to rewrite clear statutes under the banner of . . . policy concerns." *Id.* And the Supreme Court explained that the government's argument "neglected to acknowledge the potential countervailing benefits" that Congress may have intended, including helping the "agency avoid errors," especially in the Medicare context where "minor changes to the agency's approach can impact millions of people and billions of dollars." *Id.* at 582.

CMS's contention (at 22-23) that compliance with § 1395hh(a)(2) would make its preferred method for calculating Star Ratings impractical thus supplies no basis for disregarding the statute Congress enacted. If CMS believes § 1395hh(a)(2)'s requirements are incompatible with the Star Ratings system it has chosen to implement, its remedy lies with Congress, not this Court. *Id.*

And, even taken on its own terms, CMS's arguments (at 22-23) are unpersuasive. CMS has already codified by regulation *every other material aspect* of the Star Ratings system, *apart from* the measures themselves. *See* 42 C.F.R. §§ 422.160-66, 423.182-86. And since 2019, CMS has engaged in notice and comment on *new* and *updated* measures. *Id.* § 422.164(c)(2), (d)(2). Alignment's position thus asks only that CMS mildly expand the process it already uses: Instead of merely undertaking notice and comment on *new and updated* measures, it just needs to do the same for *all* measures and record them in the Code of Federal Regulations, as CMS does for all other material aspects of the Star Rating system.

Nor does CMS's parade of horribles show otherwise. For example, CMS argues (at 23) that it would be "unworkable" to publish "case-mix" "coefficients" annually. But those numerical values are simply *outputs* of CMS's rules for *how* to calculate such coefficients; the *coefficients* are not rules, requirements, or policies that establish a general "legal standard." 42 U.S.C. § 1395hh(a)(2). Alignment asks only that CMS promulgate its governing methodology, as Congress instructed. *See id.*

* * * * * *

Because the 10 measures identified above and their specifications amount to "rule[s], requirement[s], or other statement[s] of policy . . . that establish[] or change[] a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of . . . entities[] or organizations to furnish . . . services or benefits," CMS cannot apply them to Alignment because they were not promulgated "by regulation" as required by 42 U.S.C. § 1395hh(a)(2).

## III. THE COURT SHOULD VACATE ALIGNMENT'S 2026 STAR RATING, ORDER THE AGENCY TO RECALCULATE THAT RATING, AND REQUIRE CMS TO OPERATIONALLY FACILITATE MANDATORY REBATE RELIEF

In its opening brief, Alignment requested that the Court vacate Alignment's 2026 Star Ratings, order CMS to re-calculate them in accordance with the Court's opinion, and order CMS

to take the operational predicate steps necessary to afford rebate relief, including facilitating the re-submission of any bid documents CMS deems operationally necessary to do so. Alignment Br. 29-31. Alignment requested that relief because CMS has repeatedly equivocated on whether it would take the operational steps needed to afford Alignment the relief required by a judgment ordering recalculation of Alignment's 2026 Star Ratings. Alignment Br. 29-34. Alignment also demonstrated that an injunction is appropriate by showing that each of the permanent-injunction factors weighed in its favor: (1) CMS's refusal to take the necessary operational steps to facilitate rebate relief would cause irreparable harm; (2) the remedies at law are inadequate to provide complete relief; and (3) the public interest favors funding Medicare Advantage plans in accordance with the law so that they can provide benefits to the vulnerable senior populations they serve using the funding Congress afforded. Alignment Br. 32-33; *see also eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

CMS does not meaningfully dispute Alignment's showing that the requirements for permanent injunctive relief are satisfied. *See* Alignment Br. 31-34; CMS Br. 23-27. Instead, CMS argues that the appropriate remedy is traditional remand alone because "[i]f *required*," it would provide whatever rebate relief is "appropriate." CMS Br. 24 (emphasis added). But that response merely continues the exact sort of equivocation that necessitated Alignment's request for injunctive relief in the first place. CMS still will not commit one way or the other to taking the necessary operational steps to ultimately provide for rebate relief following a judgment in Alignment's favor, instead reserving for itself whether such relief is "required" and "appropriate."

CMS claims (at 24) that there are no "extraordinary circumstances" meriting a "detailed remedial order." But Alignment is not seeking a "detailed remedial order" that dictates how the agency must exercise its *discretion*, for example, a decree that dictates the operations of the agency

operating a prison system. It is seeking a one-sentence order directing CMS to take any predicate operational steps necessary to afford rebate relief required by the statute, including facilitating re-submission of any bid documents CMS deems operationally necessary to do so. CMS retains discretion, acting within statutory bounds, to determine the manner operationally to effectuate rebate relief; what it cannot do is *refuse* to take the operational steps necessary to do so.

CMS does not dispute that on remand, it must "recalculate Alignment's Star Rating consistent with the Court's opinion," CMS Br. 23, and that, *at minimum*, for contract numbers H3815 and H3443, that recalculation will produce a 4.5-Star rating, CMS Br. 10-13. CMS also does not dispute that, under the statute, CMS has no discretion over whether to effectuate rebate relief, and *must* effectuate rebate relief once it awards a 4.5 Star Rating. 42 U.S.C. § 1395w-24(b)(1)(C)(v) ("[T]he final applicable rebate percentage under this clause is—(I) in the case of a plan with a quality rating under such system of at least 4.5 stars, 70 percent."). Yet CMS is telling the Court that it would only take the needed operational steps to effectuate rebate relief "if required."

CMS's own cited case recognizes that where, as here, the statute requires a specific outcome on remand, the Court possesses authority to order that outcome, and no "extraordinary circumstances" are required. *See In re Long-Distance Tel. Serv. Fed. Excise Tax Refund Litig.*, 751 F.3d 629, 634 (D.C. Cir. 2014). The scope of the remedy in an APA case, including any injunctive orders controlling the remand, "depends entirely on the underlying statutory obligation of the agency," *i.e.*, the nature of the agency's "statutory duty" on remand. *Id.* Here, CMS does not dispute it has an "underlying statutory obligation" and "statutory duty" to take the necessary steps to effectuate rebate relief on remand, at least for contract numbers H3815 and H3443, which undisputedly would increase to 4.5 Stars on remand. CMS just casts doubt on whether it *would*

*comply* with that statutory duty itself or would only do so "if required" by the Court. CMS Br. 24 ("If required to, CMS would afford Alignment appropriate rebate relief."). CMS's continued refusal to commit to take the operational steps necessary to provide the rebate relief that follows from a judgment in Alignment's favor thus confirms that traditional remand is inadequate and narrow injunctive relief is warranted. Alignment Br. 29-34.[8]

Indeed, CMS's arguments about recalculation only underscore the point. CMS argues (at 23, 25-26) that even if Alignment prevails, it would be "inequitable" for the Court to order recalculation without the 10 challenged measures because Alignment supposedly provides "no principled basis" for distinguishing them from the other measures used to calculate its Star Ratings. It is not entirely clear what CMS is arguing here, other than that a recalculation omitting 10 measures would be "inequitable," but whatever CMS means by that, its argument is mistaken.

CMS is conflating multiple distinct issues. This challenge is an *as applied* challenge seeking vacatur of Alignment's 2026 Star Rating. To vacate *that Star Rating*, Alignment is challenging the *application to it in that Star Rating* of 10 specific measures that harm Alignment in its 2026 Star Rating. APA litigants may choose whether to launch a facial attack on a rule or policy in all of its applications, seeking a vacatur of that rule or policy, or an as-applied challenge to a *specific* agency adjudication, such as Alignment's 2026 Star Ratings, when the challenged policy is *applied* to the challenger. *See Koretoff v. Vilsack*, 707 F.3d 394, 400 (D.C. Cir. 2013) (Williams, J., concurring).

---

[8] CMS has suggested that the Court should not afford this relief because such relief should be afforded, if at all, in a future case if CMS flouts the statute's mandates. *See* Dkt. No. 11 at 7. But, as explained, CMS is bound by statute to effectuate rebate relief, so the court should reject CMS's suggestion to defer that issue to a subsequent suit, and should instead address it at this juncture.

And when it comes to an as-applied attack on *its* 2026 Star Ratings, Alignment's standing extends to challenging the measures that *injure* Alignment, not to measures that *do not injure* Alignment. While CMS is likely correct that there are other measures that could be subject to the same as-applied attack, *Alignment has not challenged, and could not challenge, the application of those measures* to determine its 2026 Star Rating. That limited challenge is a consequence of federal courts' jurisdictional limitations. The Courts do not answer abstract questions such as, "how many of CMS's measures would be subject to challenge for inadequate procedures if this argument were extended." To possess Article III standing, a party need not and *cannot* challenge other measures that *benefit* that party. Indeed, CMS cannot simultaneously demand (at 10-13) that Alignment prove a concrete, redressable injury to establish standing, and then attack Alignment (at 25-26) for targeting only specific measures that actually injured it. Alignment targeted flawed measures that harmed it because federal courts do not issue advisory opinions about measures that caused no harm.

So, contrary to CMS's assertions, there is a "principled basis" for vacating CMS's determination of Alignment's 2026 Star Rating with the inclusion of the 10 challenged measures: That is all that the complaint challenges, and Article III does not allow Alignment to launch an abstract broadside against every measure that *helps* it. That is Article III, not "inequity."

And we know that CMS's argument that it is "inequitable" to conduct a recalculation with these 10 measures removed is incorrect, *because CMS has already exercised its discretion on remand to do just that.* In *Clover*, the court ordered CMS to recalculate Clover's 2026 Star Rating without these 10 challenged measures. CMS purportedly had discretion for how to implement that command. Indeed, when it came to the *other Clover* holding (regarding another set of 10 other measures that exceeded CMS's *statutory authority*), CMS exercised that discretion to treat as

*invalid* additional measures going *beyond* the scope of the 10 measures in the *Clover* court's holding. Dkt. No. 14-3, CMS, Update to 2027 Quality Bonus Payment Determinations (June 17, 2026) (treating a broader set of measures as invalid pursuant to *Clover*'s statutory authority holding). But CMS exercised its purported discretion in a different way for the 10 measures at issue here: CMS removed *just* those 10 measures; performed the recalculation with removal of just the 10 measures at issue; and awarded Clover a 4.5 Star Rating. *See* Elevance Goldstein Decl. ¶¶ 11-14. CMS should not be heard to complain it is "inequitable" for it to perform the same recalculation *it just exercised discretion to perform.*

The real point of contention is not whether such a recalculation is inequitable: CMS itself *has already done so*. Instead, the real issue is whether CMS can just stop there or also needs to take the necessary operational steps to facilitate any rebate relief required by the statute. As explained above, CMS continues to equivocate on this point, claiming it would do so "if required." In light of CMS's continued equivocation on that point, the Court should order CMS to take the predicate operational steps necessary to afford rebate relief, including facilitating the re-submission of any bid documents CMS deems operationally necessary to do so. Alignment Br. 29-34.

**CONCLUSION**

For the foregoing reasons, this Court should grant Alignment summary judgment, deny CMS's cross-motion for summary judgment, set aside CMS's determination of Alignment's 4-star Star Ratings and of the 10 challenged measure-level Star Ratings published for Alignment's contracts, order CMS to redetermine Alignment's 2026 Star Ratings in a manner consistent with this Court's decision without inclusion of the 10 challenged measures, and order CMS to take the predicate operational steps necessary to afford rebate relief, including facilitating the re-submission of any bid documents CMS deems operationally necessary to do so.

Dated: September 22, 2026

Respectfully submitted,

/s/ Andrew D. Prins
Andrew D. Prins (D.C. Bar No. 998490)
Rachael L. Westmoreland (D.C. Bar No. 90034032)
Dorothy M. Canevari (D.C. Bar No. 90043751)
Halle H. Edwards (D.C. Bar No. 1780113)
LATHAM & WATKINS LLP
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
Tel: (202) 637-2200
Fax: (202) 637-2201
Email: andrew.prins@lw.com
rachael.westmoreland@lw.com
dolly.canevari@lw.com
halle.edwards@lw.com

Nicholas L. Schlossman (D.C. Bar No. 1029362)
LATHAM & WATKINS LLP
300 Colorado Street, Suite 2400
Austin, TX 78701
Tel: (737) 910-7300
Fax: (737) 910-7301
Email: nicholas.schlossman@lw.com

*Attorneys for Plaintiffs*